Syllabus.

### Richmond.

100    69
103    677

100    69
106    378

CHESAPEAKE & OHIO RAILWAY CO. .v. WALKER AND OTHERS.

January 23, 1902.

Absent, Whittle, J.

1. STATUTES—*Construction—Grants of Power—Eminent Domain.*—All grants of power by the government are to be strictly construed, and this is especially true with respect to the power of eminent domain. But such construction must be given as will, if possible, give effect to all the words of the grant, and to the chief and manifest purpose for which it was made.

2. CORPORATIONS—*Riparian Rights—Accretions—Case in Judgment—James River and Kanawha Canal.*—In the absence of any statutory restriction, a corporation which is the fee simple riparian proprietor of land can acquire land by accretion. In the case in judgment, construing as a whole the acts authorizing condemnation or purchase, the James River and Kanawha Canal Company was not limited to the acquisition of a mere easement or right of way, but had power to acquire, and did acquire, a fee simple title to low-water mark on James river, with capacity to take by accretion, and the appellant, which is its successor in title, is the owner of the land in controversy which was created by deposits and accretions to the land condemned; and the water line on James river, no matter how it shifts, remains the boundary of its property.

3. JAMES RIVER AND KANAWHA CANAL COMPANY—*Condemnations—Recordation.*—Under the charter of the James River and Kanawha Canal Company, condemnation proceedings were required to be taken in the Circuit Courts, and the report of the commissioners to be there recorded. The charter did not require such reports to be recorded in the deed-books in the County Courts as is now required by sec. 1091 of the Code, and the failure to record in such deed books did not give to subsequent purchasers for value without notice title superior to that acquired by the condemnation proceedings.

4. CORPORATIONS—*Excess of Charter Powers—Question for State—Real Estate.*—The right of a corporation to acquire or hold real estate cannot be questioned save by the State.

5. EQUITABLE ESTOPPEL—*Transfer of Title.*—To constitute an equitable
estoppel that will operate to transfer title to property the party
estopped must have been apprised of the true state of his own
title, and must have been guilty of fraud, actual or constructive, or
of negligence so gross as to imply fraud, and the other party must
not only be destitute of all knowledge of the true state of the title,
but of any convenient means of acquiring such knowledge; and he
must have relied upon the admissions of the party estopped to such
an extent as that·he will be injured by allowing their truth to be
disproved. For a full discussion of equitable estoppel, see opinion
of KEITH, P.

Appeal from a decree of the Circuit Court of the city of
Lynchburg, pronounced September 21, 1900, in a suit in chan-
cery, wherein the appellant was the complainant, and the ap-
pellees were the defendants.

*Reversed.*

The opinion states the case.

*Harrison & Long,* for the appellant.

*F. S. Kirkpatrick,* for the appellees.

KEITH, P., delivered the opinion of the court.

It appears from the bill of the Chesapeake and Ohio Railway
Company that Samuel Miller, under whom all parties to this
litigation claim, was seised of two parcels of land near the
city of Lynchburg, which were devised to him by the will of
his brother, John Miller:

These lots were bounded on the south by Lynch street, and
on the north by low water mark of James river. In the year
1836, the James River and Kanawha Canal Company instituted
proceedings in the Circuit Court of Campbell county to con-
demn a right of way through these lots, and a survey of what
was necessary for its purposes was made by B. H. Kennedy,
which bears date the 2d day of June in that year.

The assessors appointed by the court returned their report,
in which they state that they had gone upon the land of John

Miller, in the county of Campbell, which the Canal Company proposed to condemn for its use, and, having viewed the premises and heard evidence, they ascertained the quantity of land to be one acre, two roods, and thirty-nine and one-half perches, and fixed the damages at the sum of $125. This report bears date 19th of November, 1836, and, at a session of the Circuit Court held in April, 1837, it was produced in court and ordered to be recorded. Upon the following day this entry appears upon the proceedings of the Court: "James River & Kanawha Co. vs. John Miller. Upon a report of the assessors for assessing damages by occasion of the James River and Kanawha Canal running through his lands.

"This day came the plaintiffs, by their attorney, and the defendant being solemnly called, but came not, and on hearing said report filed and returned in this case, and the said plaintiffs, by their attorney, moved the court to confirm and record the same agreeable to an act of assembly in that case made and provided, it is considered by the court that the said report be confirmed and recorded, and that the said company pay to the said Miller the sum of one hundred and twenty-five dollars, as assessed by the commissioners in said report mentioned."

Then follows the receipt of John Miller, acknowledging the payment of the damages as of the 12th of April, 1837.

The James River & Kanawha Company held title to the land thus condemned until March 4, 1880, on which day it conveyed all of its rights, franchises, and property, including the lot aforesaid, to the Richmond & Alleghany Railroad Company, which in like manner held title and possession until January 20, 1890, when it conveyed to the Chesapeake & Ohio Railway Company, which avers that it has since that time had title to the land originally condemned for the use of the Canal Company, and now holds possession of it with the exception of a strip of 50 feet by 200 feet which is in the occupancy of the Hughes Buggy Company.

So much of the John Miller lots heretofore mentioned as were not embraced in the condemnation passed under his will to his brother, Samuel Miller, who conveyed at different times, and by three several deeds, all of his land lying between the canal and Lynch street, but never asserted any claim or title to any part of the lot lying between the canal and the river, and his heirs and devisees have made no such claim.

It is averred that in 1896 John Stewart Walker, assuming that the canal condemnation through the Miller lot was 100 feet in width, and finding that a considerable parcel of land lay between that limit and what was then low water mark of James river, the greater part of said lot having come into existence by deposits made upon it, and by natural accretions to the original lot condemned, attempted to acquire title to it upon the theory that it was a part of the estate of Samuel Miller, which passed under his will to the Miller Manual Labor School, of Albemarle.

On the 23d of November, 1896, Walker entered into a contract with the school, in which it agreed to sell him this land, with special warranty of title, for the sum of $50.00, upon condition that he should institute, at his own expense, proceedings in the Circuit Court for the city of Richmond, and that the said court should order and decree:

"First. That the land aforesaid is part and parcel of the real estate of which Samuel Miller died seised.

"Second. That it passed by said Miller's will to 'The Miller Manual Labor School of Albemarle,' and

"Third. That the said 'Miller Manual Labor School of Albemarle' holds title thereto and is empowered to make sale thereof."

The land for which Walker thus contracted fronts on the river 561 feet, with an average width of about 147 feet, as stated in the bill.

On the 11th of December, 1896, Walker instituted a suit in the Circuit Court of Richmond city against the Miller Manual Labor School, as sole defendant, in which he sets out his contract with the school, and asks the court to enter a decree in conformity thereto.   On the same day, a decree was entered referring the cause to a special commissioner, who was directed to make enquiry as to the conditions in the contract above set forth, and on the 16th of December, 1896, the commissioner returned his report, answering affirmatively the three enquiries submitted to him.   It is averred that no evidence was taken by the commissioner, and none was returned with his report which adopted the recitals in the bill.   The report makes no reference to the fact that any part of the John Miller lot had been condemned and appropriated by the Canal Company, but the rights of the said company are altogether ignored.   Upon the filing of the report, a decree was entered confirming the same, and five days after the institution of the suit a deed, with special warranty of title, was executed by the Miller Manual Labor School, conveying the property in the proceedings mentioned to the complainant, John Stewart Walker.

It appears that the Chesapeake & Ohio Railway Company had no knowledge of this litigation.  The record in the suit brought by Walker is made an exhibit with the bill in this case.

On the 20th of April, 1897, Walker conveyed an undivided half interest in the lot to Alfred B. Percy, the attorney who represented him in those proceedings, and, on the 23d of November, 1898, Walker and Percy conveyed the whole of the lot, for the consideration of $1,500.00 cash, to the Industrial Building Company, and that company, with Hughes and Barbour, doing business as the Hughes Buggy Company, on May 15, 1899, conveyed to the Norfolk & Western Railway Company, by deed, which was duly recorded, a right of way 30 feet wide next to the river, extending through the lot in controversy.

The bill avers that neither Walker nor any of his alienees have taken possession of any part of the ground in dispute, except a space 50 by 200 feet, which is in the possession of the Hughes Buggy Company, but that the Norfolk & Western Railway Company is seeking by an action of unlawful detainer to acquire possession of the right of way which was conveyed to it. It is claimed in the bill that the Miller School had no right or title to the land which it attempted to convey; that its deed to Walker, or those claiming under him, is ineffectual to vest title, but that it constitutes a cloud upon the title of the plaintiff. The prayer of the bill is that the deeds from the Miller School to Walker, from Walker to Percy, Walker and Percy to the Industrial Building Company, and from the Building Company and the Hughes Buggy Company to the Norfolk & Western Railway Company be set aside and annulled; no relief, however, being asked as against the Hughes Buggy Company in this proceeding.

The bill filed by Walker in the Circuit Court for the city of Richmond sets out the title of the Miller School, beginning with the conveyance by Lynch and wife of January, 1824, and ending with the will of Samuel Miller. It avers that in 1840 the James River and Kanawha Canal Company condemned a strip of land 100 feet wide through the Miller lot; that on the 1st of November, 1849, Miller conveyed another strip 100 feet wide through this property, between the canal and Lynch street, to the Virginia & Tennessee Railroad Company, thus leaving, as the bill alleges, a strip of from 20 to 100 feet in width between the canal and James river, and then follows the proceedings in the Circuit Court for the city of Richmond, which have already been sufficiently set forth.

The answer of the Norfolk & Western Railway Company states at length the several grounds of defence to the complainant's bill. It denies that the Canal Company acquired title to all of the land between its southern limit and low water

mark on James river, or that it ever claimed or asserted title
beyond the limits of 100 feet in width through the premises
in question. · The answer states that the Lynchburg Industrial
Company acquired title to this property with a view of locating
upon it industries which would be beneficial to the city of
Lynchburg, and to that end agreed to construct a building for
the Hughes Buggy Company, giving it a lease for five years,
with the privilege of purchasing at the end of that period;
that the Industrial Building Company erected the building
upon the property at a cost of about $7,000; and that, with the
consent of the Buggy Company, the Chesapeake & Ohio Rail-
way Company put down a siding in front of this building, and
deceitfully and surreptitiously placed a siding behind the build-
ing, between the lot of the Buggy Company and James river.
It is charged that, before the building designed for the use of
the Buggy Company was commenced, the Chesapeake & Ohio
Railway Company was fully informed of the claim which the
Industrial Company asserts to the premises in dispute; that it
was shown a plat of the property, and was consulted by the
agents of the Industrial Company in regard to the place at
which the building was to be erected; and, with full knowledge
of all its rights in the premises, and those of the Industrial
Company, it remained silent with respect to any adverse claim,
and permitted the Building Company to purchase the premises
and make the improvements which have been described.

The answer alleges that Walker and Percy, before contract-
ing with the Miller School, made exhaustive research for in-
formation which would throw light upon the title in dispute,
that nowhere could they find any trace of the complainant's
right with respect to it, and that the proceedings in the Circuit
Court for the city of Richmond were conducted with the utmost
good faith.

It is charged that the Industrial Company, before making
purchase, caused the title to be investigated by a law firm in

the city of Lynchburg, who were their regular counsel, and that they reported that the title was in Walker and Percy, free from all adverse claim upon the part of any other person whatsoever. It is charged that the Building Company acquired this property, without actual or constructive notice of any right upon the part of the complainant; that it acted in good faith, openly and above board. The answer denies that the Canal Company, by condemnation, acquired, or was capable of acquiring, a title which would attract unto itself deposits or accretions, but, on the contrary, it is alleged that such accretions belonged to and were the property of John Miller and his devisees.

Upon the issues thus made by the pleadings, depositions were taken, the cause was submitted to the Circuit Court for decision, and it entered a decree in favor of the appellees, and the Chesapeake & Ohio Railway Company obtained an appeal from one of the judges of this court.

Our first enquiry shall be as to the nature of the title acquired by the Canal Company, by virtue of the condemnation proceedings in the Circuit Court of Campbell county; and, in order to do so, we shall be compelled to examine the acts by which the James River & Kanawha Company was incorporated. In making that investigation we shall not be unmindful of the rule of strict construction which applies to such cases: "All grants of power by the government are to be strictly construed, and this is especially true with respect to the power of eminent domain, which is more harsh and peremptory in its exercise and operation than any other." Lewis on Eminent Domain (2d ed.), sec. 254. To construe such an act liberally would be sinning against the rights of property. *Binney's Case*, 2 Bland. Ch. 99. But such a construction must necessarily be given as will, if possible, give effect to all its words, and to the chief and manifest purpose for which it was passed.

The object for which the company was incorporated was to

connect tidewater of James river with the navigable waters of the Ohio river, and this was to be done either by the construction of a canal between those points for the entire distance, or, to the extent to which it might prove impracticable to do so, the interval between the terminus of the canal upon the east of the Alleghanies and that upon the west side of that great obstacle was to be occupied by a railroad so as to make a commodious and permanent line for the movement of commerce between the east and the west.

The Act of 1831-'2 provides for the appointment of assessors in each county where it was necessary to condemn land for the purposes of the company, and the power of condemnation was limited to 100 feet in breadth; but, by the Act of March 19, 1836 (Session Acts 1835-'6, p. 84), the company was authorized to acquire by purchase or condemnation along its line, when it was found necessary to do so, more than 100 feet, "provided that such additional quantity of land shall not exceed one hundred feet in width, and so much more of the sunken grounds and narrow ravines on the opposite side to the tow-path, as the water to the canal may actually overflow;" and, for the purpose of assessing damages on land condemned for its uses, the Board of Public Works was directed to appoint five persons, any three or more of whom might act, to constitute a board for the assessment of damages throughout the whole line of improvement. They were empowered, when directed to do so by the company, to assemble on the land proposed to be condemned, view the same, hear evidence offered by either party, ascertain the damages incurred, and make a report of their proceedings in form prescribed by the act. This report they were required to return to the Circuit Court of the county, in which the land, or the greater part thereof, was situated, and, unless good cause was shown against it, it was to be confirmed by the court and promptly recorded. Upon the confirmation of the report, the payment or tender to the proprietor of the damages so assessed,

·or the payment of damages into court, "the land viewed and assessed as aforesaid shall be vested in the James River & Kanawha Company in the same manner as if the proprietor had sold and conveyed it to it."

Section 22, Acts 1831-'2, p. 78, which was not amended by the Act of 1835-'6, after setting forth the object for which the charter was granted, and the duties with which it was charged, to-wit: the construction of a great and permanent highway to which we have already adverted, and referring to the choice of means by which this object was to be accomplished, continues: "And whether they elect one or another of these plans of improvement, that which they elect shall be executed in a substantial, durable, and workmanlike manner. Their improvements shall be kept permanently in good repair, free and fit for public use, according to the provisions of this act; and the works which they shall construct, and the property which they shall acquire by purchase or condemnation, under the authority of this law, shall be vested in them and their successors forever, for their own use and benefit, exempt from all public taxes, burdens, or charges, other than those which may be imposed or authorized by this act."

By the 2d section of the Act of 1835-'6, the company was authorized to purchase from the proprietors such "small parcels of land as being cut off from the main body of the tract, and lying between the canal and the river, would be inconvenient for the proprietor to hold, and burdensome for the company to connect by bridges with the other lands of the proprietor, and such other small parcels of land lying convenient to the company's line of improvement, and containing quarries of stone or marble, water-proof lime, coal or other minerals, which would be useful to the company in constructing and repairing their works, and in carrying on their appropriate business; provided, that no one parcel of land so to be purchased shall exceed one hundred acres, and that the whole together shall not exceed two thousand acres."

Reliance is placed by appellees upon a statement which frequently recurs in both of the acts referred to, and notably in the form of oath which the assessors were required to take, and in the report which they were required to make, that the lands to be condemned, and the damages to be assessed, "were for the use of the company," the word "use" being relied upon as limiting the interest acquired to an easement or right of way.

When we consider the act as a whole, that the company was authorized to purchase without any limitation, express or implied, upon the interest thus to be acquired; when we find it stated more than once in the act that the land condemned shall be, upon the payment of the purchase money, "vested in the James River & Kanawha Company as if the proprietor had sold and conveyed it to them"; when we consider the vast magnitude of the work to be constructed, the enormous outlay which was contemplated, and the enduring character of the improvement, we cannot doubt, in the absence of all express restriction in the acts of incorporation, that the legislature intended to confer, and did confer, upon the James River & Kanawha Company power to acquire by condemnation, or purchase, the fee simple interest in the lands to be occupied by its works.

The quality of estate taken by the Canal Company has never been passed upon directly by this court, but in *James River & Kanawha Company* v. *Turner*, 9 Leigh, 313, in which land was condemned for the use of the Canal Company, the decree of the Circuit Court recited that upon the payment of the damages in the report assessed, the land therein described should be vested in the company in fee simple. To this decree the landowner made no objection, but an appeal was taken by the Canal Company, and the decree of the Circuit Court was affirmed. It is true that the point before us was not considered, but, the case being here, it is reasonable to suppose that so able and astute a lawyer as Mr. Stanard, who represented the appellee,

would have asked the court to correct any error to the prejudice of his client, and, if of opinion that only an easement could be condemned for the use of the Canal Company, he would have seen to it that no more than an easement was taken.

The direct question was before the Circuit Court for the city of Richmond in the case of *Terrell & Bocock* v. *Richmond & Alleghany R. R. Co.*, predecessor in title to appellant. The case involved property of great value. The bill was filed by Kean & Kean, of the Lynchburg Bar, and the Circuit Court held that the defendant company had a fee simple title to the land in dispute. This case was decided by a Circuit Judge of great experience and learning, and his decree, though disposing of large property rights, was never appealed from.

The line of the Canal Company extends from Tidewater at Richmond nearly to the western border of the State, and yet, as far as we are informed, except in the instances to which we have referred, the fee simple title of the Canal Company and its successors has never been called in question.

Having reached the conclusion that the Canal Company took a fee simple to the property condemned, we believe that it is not disputed that the appellant is the lawful successor to its title, and vested with whatever rights it could transmit.

The controversy in this case is with respect to a parcel of land lying between the northern boundary of the lot as originally condemned and the present water line of James river. The land thus situated has been formed in part by gradual deposits and accretions made by the river, but in large measure by cinders and slag which were dumped upon it.

Some time after 1886 the manager of the Lynchburg Iron Company was informed by an officer of the Norfolk & Western Railway Company that it must discontinue dumping its cinders where it had been theretofore accustomed to deposit them, because it diverted the current of the river in a manner injurious to the railroad. Thereupon the Furnace Company asked and

obtained permission from the Richmond & Alleghany Railroad
Company to use its water front as a dumping ground.   This
process was continued for several years, and resulted in ele-
vating the shore, and forming quite an area of hard dry land,
the title to which is the subject of this controversy.

We shall next inquire as to the northern boundary of the
land condemned, so as to determine whether or not it extended
to low water mark on the James river so as to make the Railroad
Company a riparian proprietor.

The land acquired by John Miller had for its southern
boundary Lynch street.   The line upon the west, as shown
by the deed, runs from Lynch street in a northerly direction
330 feet to low mater mark on James river.   The eastern
boundary commences at Lynch street, and runs in a north-
erly direction 363 feet to the river.   Kennedy's survey, which
accompanies the report of the assessors, gives the width of the
land condemned as 132 feet upon the western, and 172 feet
upon its eastern, boundary.   After the condemnation, Miller
sold to the Virginia & Tennessee Railroad Company a parcel
of land extending through his lot east and west, and 100 feet
wide from north to south, and, by subsequent deeds, disposed of
the rest of his real estate lying between the southern boundary
of that conveyed to the Virginia & Tennessee Railroad Com-
pany and Lynch street.   The last parcel conveyed by Samuel
Miller was 132 feet on its western boundary, and 74 feet on
its eastern boundary.   It will be recalled that upon the west
the line from Lynch street to James river was 330 feet.   There
was condemned for the Canal Company, as shown by the Ken-
nedy survey, 132 feet.   There was conveyed to the Tennessee
road 100 feet, and there remained 132 feet, making an aggre-
gate of 364 feet.   As 330 feet reached lower water mark, 364
feet overstepped that limit by 34 feet.   Upon the eastern
boundary, the condemnation was 172 feet.   There was sold to
the Tennessee road 100 feet, the eastern boundary of the last

lot conveyed was 74 feet, making an aggregate of 346 feet. This line of the lot, as originally conveyed to Miller, was 22 poles, or 363 feet, so the line of condemnation upon the east appears not to have reached low water mark by 17 feet. But low water mark is a variable, and not a fixed and ascertained position.

Two witnesses for the plaintiff, both of whom are engineers and surveyors of large experience, applying the Kennedy survey to the land in question, testified that the condemnation in 1836 must have reached low water mark. A civil engineer, equally competent no doubt, called on behalf of appellee, testifies "that the area of the Kennedy survey apparently covers everything from the south of the canal to the river, or nearly to the river, and includes 1 acre, 3 roods and 23 poles."

Considering these deeds and this testimony, we have reached the conclusion that the original condemnation extended to low water line. It is altogether improbable that the small triangle, which is all that could by possibility have interposed at the lower extremity between the line of condemnation and the river, should have been excepted from the operation of the condemnation proceedings. During sixty years no claim has been asserted by the Millers or any other person to any part of it, but so far as this record discloses, it has remained during that period in the undisturbed possession of the Canal Company and its successors in title.

The appellant being then a simple riparian proprietor, was it entitled, *jure alluvionis*, to the accretions upon the river shore?

"Land formed by alluvion, or the gradual and imperceptible accretion from the water, and land gained by reliction, or the gradual and imperceptible recession of the water, belong to the owner of the contiguous land to which the addition is made. There is no distinction in this respect between soil gained by accretion and that uncovered by reliction. The change is imperceptible when it is not discernible in its progress, though the

fact that there has been an increase may be perceptible year by year, or at shorter intervals." Gould on Waters (3d ed.), sec. 155.

In *New Orleans* v. *United States*, 10 Peters, 662, it is said: "The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually, by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain."

And in *Banks* v. *Ogden*, 2 Wall. 57, it is said: "The rule governing additions made to land bounded by a river, lake or sea, has been much discussed, and variously settled by usage and by positive law. Almost all jurists and legislators, however, both ancient and modern, have agreed that the owner of the land thus bounded is entitled to these additions. By some, the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion; by others, it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore itself."

In *St. Clair County* v. *Lovingston*, 23 Wall. 46, the court says: "In the light of the authorities, alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. . . . . . The test as to what is gradual and imperceptible in the sense of the rule is that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on."

This subject is elaborately treated, and the authorities, English and American, are discussed in *Jefferies* v. *East Omaha Land Co.*, 134 U. S. 178; and *Municipality No. 2* v. *Orleans Cotton Press*, 18 La. 122, O. S., p. 436.

The Virginia cases are to the same effect. In *Norfolk City* v. *Cooke*, 27 Gratt. 430, the rights of a riparian proprietor are fully recognized and declared not to be a mere license or privilege, but property in the soil, though covered by water. See also *Groner* v. *Foster*, 94 Va. 650; *Waverly Water Front Co.* v. *White*, 97 Va. 176, and note to the latter case in 45 L. R. A. 227.

Appellee contends that whatever may be the rights of natural persons as riparian proprietors, the Canal Company could not acquire nor transmit a title to a greater parcel of land than it was authorized by its charter to condemn and hold.

No case directly decisive of the point has been cited. Reference was made, and reliance seems to be placed, upon *Rumsey* v. *Railway Company*, 114 N. Y. 423; and *New York &c. R. R. Co.* v. *Aldrich*, 135 N. Y. 83. We shall not discuss those cases further than to say that the courts do not profess to dispose of them upon the common law principle, but in obedience to the terms of New York statute law. Nor do we find any support of appellee's contention in the case of *Illinois Central R. R. Co.* v. *Illinois*, 146 U. S. 387. That case does not declare any common law limitation upon corporate capacity to acquire land, *jure alluvionis* or otherwise, but holds that, under the circumstances of that case, the railroad company was not entitled to the land in controversy.

There is no limitation in the charter of the Canal Company, or of the Chesapeake & Ohio Railway Company, which imposes upon them any such "corporate limitation" as appellee relies upon, and we know of no principle of the common law upon which such limitation could be sustained. We have examined a great number of cases, and we have nowhere seen it intimated

that a corporation, upon which, by its charter or the statute law, no disability had 'been imposed, could not acquire land by accretion where it was a fee simple riparian proprietor.

The Canal Company was, by the Act of 1835-'6, expressly authorized by section 2 to purchase such small parcels of land as being cut off from the main body of the tract and lying between the canal and the river would be inconvenient for the proprietor to hold, and burdensome for the company to connect by bridges with other lands, provided that no one parcel so to be purchased shall exceed 100 acres. The fee simple title being in the Canal Company, the accretions to its property would follow its title which could not be questioned in respect to its inability to acquire or hold save by the state. This proposition has long been the established law with us. *Banks* v. *Portiaux*, 3 Ran. 136; *Fayette Land Co.* v. *L. & N. R. Co.*, 93 Va. 274.

"Riparian rights in a stream pertain to the land abutting on the stream. They pass with the title to the property, and are the same whether the property is owned by a natural or an artificial person. The rights are not dependent upon the uses made of the property, or the purposes for which it is held. The fact that the property is held for public use, therefore, would not seem to affect the question of riparian rights." Lewis on Eminent Domain, section 61b.

We conclude, on this branch of the case, that the Chesapeake & Ohio Railway Company is a fee simple riparian proprietor, clothed with capacity to take *jure alluvionis*, and that the water line upon James river, no matter how it shifts, remains the boundary of its property, and that it and those under whom it claims having acquired title and possession, it attaches to all the accretions which have been added to it. *Jones* v. *Johnson*, 18 How. 150; *Jefferies* v. *Omaha Land Co., supra.*

Another contention made on behalf of appellee is that the James River & Kanawha Company failed to record its title in

the County Court, and its rights are therefore subordinate to those of the appellees, who, it is alleged, are *bona fide* purchasers for value and without notice, actual or constructive, of appellant's claim to the property in question.

It is true that the condemnation proceedings under which the Canal Company acquired title were not recorded in the County Court, and for the obvious reason that the law required their recordation in the Circuit Court.

By the amended act of 1835-'6, it is provided that the proceedings shall be taken in the Circuit Court of the county in which the land to be condemned lies. To that court the assessors returned their report, which, unless good cause be shown against it, the statute says, "shall be confirmed by the court, and recorded at the first term to which it shall be returned, or as soon thereafter as may be."

The law at present with respect to the taking of property for works of internal improvement is found in chapter 46 of the Code. The county and corporation courts are given exclusive jurisdiction, and, where the mode prescribed by statute has been pursued, the fee simple, except in the case of a turnpike company, is vested in the Improvement Company. By section 1091, it is provided that "the clerk of the court wherein there is a condemnation of land for the benefit of a corporation, shall make and certify a copy of so much of the reports, orders, and proceedings in the cause as shall show such condemnation . . . to the clerk of the court of the county or corporation in which the land lies, or to the clerk of the Chancery Court of the city of Richmond, if the land lies within the corporate limits of said city, who shall record the same in his deed-book, and index it in the name of the person who had the land before, and also in the name of the said corporation." These provisions are essentially different from the proceedings prescribed by the charter of the James River & Kanawha Company.

A part of this contention may be more conveniently treated

under the remaining proposition which the appellees consider conclusive of the case in their favor.

It is thus stated in their brief: "If the appellant's title be perfect in law, its conduct in reference thereto has been of such a nature that it is estopped in good faith from now asserting it, as equity will not permit one who has, by positive acts, disclaimed its title, to disavow such acts, when to do so would work a fraud on the rights of those who have been misled by the position formerly assumed, nor will it suffer one who has through negligence failed to assert its title, when circumstances were such as to require positive action, to dispossess those who have, in consequence of such negligence, erected costly buildings upon the property involved."

It is necessary to the proper treatment of this question to state the facts bearing upon it. The first intimation that came to the Chesapeake & Ohio Railway Company that Walker made any claim to the property in dispute was by means of a letter addressed by him to Mr. Frazier, at that time Chief Engineer of the road, with respect to another parcel of land which was accompanied by a map upon which the lot in controversy was noted as the property of Walker. Frazier at once replied: "Referring to the blue print sent me with yours of the 13th inst., I notice the tract of land just west of Lynchburg Iron Works, marked 'John Stewart Walker.' This land has been in the possession of this company and its predecessors since the construction of the James River and Kanawha Canal.

This for your information.

Yours truly,

(Signed)                    H. FRAZIER,
                                 Chief Engineer."

To this letter Walker replied that he had bought the property from the Miller Manual School, who received it by law from Samuel Miller, and "my lawyer says my title is perfectly clear."

This correspondence, it will be observed, took place in Feb-

ruary, 1897. In December, 1896, Walker, as we have already seen, had filed a bill in the Circuit Court for the city of Richmond, asking the specific performance of a contract entered into between himself and the Miller School, with respect to the purchase of this property of date November 25, 1896. In his bill he deduces title from Lynch, who conveyed in 1824 to Drisbell, and from him through successive alienations to the Miller School as the residuary devisee of Samuel Miller. The bill alleges that "some time about 1840 a strip of land 100 feet wide was condemned through the above described property for the James River & Kanawha Canal, and that by deed of the 1st day of November, 1849, recorded in deed-book "S," page 412, Samuel Miller conveyed to the Virginia & Tennessee Railroad Company all the property which lay between the canal and Lynch street, thus leaving a strip of ground from 20 to 100 feet wide between the James River & Kanawha Canal and James River."

It fully appears, therefore, that Walker, in making the purchase, acted upon his own initiative, relied upon his own sources of information, conducted his own investigation, and makes no pretense that he was influenced by representation from any quarter whatsoever.

By letter of May 2, 1898, Frazier informed Mr. Wickham, the general solicitor of the company, of the claim made by Walker, and Mr. Wickham, upon its receipt, requested the local counsel of the Railway Company at Lynchburg to investigate the matter. To this letter of May 2, Mr. Blackford replied, under date of May 3, stating the title in almost identical terms with those employed by Walker in his bill filed in the Circuit Court for the city of Richmond, and concludes as follows: "If you will give us any additional information we will look into it, but as it stands now we do not see that Mr. Walker has any property which belongs to the Chesapeake & Ohio Railroad Company."

Referring to this letter in his deposition, Mr. Wickham states

that Mr. Blackford was a member of the firm which were local counsel for the Chesapeake & Ohio Railway Company, in Lynchburg, employed to attend to such local business as he should send them. "My understanding of their power and authority as local counsel was that they attended to such business of a legal nature, and rendered such professional services as they might be called upon by me to render in pursuance of a general retainer, and an agreement as to salary." As there is no contradiction of this statement of the relations between the firm of which Mr. Blackford was a member and the Chesapeake & Ohio Railway Company, it must be accepted as correct. Mr. Wickham admits that, relying upon what he understood to be independent investigation on the part of Mr. Blackford, his letter impressed him with the opinion that the Chesapeake & Ohio Railway Company had no just claim to the land in dispute.

On the 23d of September, 1898, Percy, who in the mean time had received a deed for one-half of this land from Walker, united with Walker in the conveyance of the whole of it to the Industrial Building Company. As to what transpired with reference to the title while the negotiation was going on which culminated in this deed, Mr. Hughes, who was a director, secretary and treasurer of the Industrial Company, in answer to the question: "What occurred at the time the purchase of the property in controversy from Messrs. Walker and Percy was being considered and consummated, so far as the question of title is concerned?" replied as follows: "The question was raised—I think by myself—as to whether or not the title should be examined, and the matter was laid over until the next meeting, at which Mr. Percy and Mr. Colston Blackford attended. Mr. Colston Blackford stated that the title had been gone over by his father a short time previous to this time, and that his father stated that he was satisfied that a good title lay in Messrs. Walker and Percy, and, on his opinion, and coupled with the fact that we had a deed conveying the title with gen-

eral warranty, we decided to accept this title without further examination."

Mr. Gordon Payne, the President of the Industrial Building Company, testified to the same effect: "The question of title was brought up at one of the meetings of our board, and we decided that it was proper to have the title to the property examined, but we were assured by Mr. Percy, one of the owners from whom we were buying the property, that he and Mr. Walker had had the title examined by Blackford, Horsley & Blackford, and subsequently Mr. Percy got Mr. Colston Blackford, of that firm, to come down to our board meeting, and Mr. Colston Blackford confirmed what Mr. Percy had said, and said that the title which Walker and Percy had in the property was good. And we did not care to look any further back than the title to Walker and Percy, and, having the assurance from Mr. Blackford that his firm had examined the title for them, we did not ourselves have any examination of the title made."

The conduct of certain officers of the Chesapeake & Ohio Railway Company is relied upon as constituting an estoppel to the assertion of a title adverse to that of appellees.

Mr. Woodson, who superintended the erection of the building of the Hughes Buggy Company on the property in litigation, states that he wrote to the Chesapeake & Ohio Railway Company, enclosing them a tracing of the lot upon which the building was to be erected, and saying that he understood that the company owned, or held a controlling interest in the Turnpike Company, and would have authority to give permission to have a siding put upon its right of way if it desired to do so. To this letter he received an answer that it could not be decided without investigation, but that an engineer would be sent to look over the situation and advise whether or not the request should be granted. The engineer came, and was seen by Mr. Woodson. The situation was examined, and as a result the permission asked was not granted. This transaction is relied upon, we pre-

sume, as tending to show that the Railway Company was informed of the purpose to improve the property in question, and that its silence misled appellees to their injury.

Mr. Stevens, referring in his deposition to this transaction, says that the only subject brought to his mind was whether or not it was feasible or desirable to occupy any portion of the turnpike with a side track, and that he had no thought whatever of the title of the Railway Company to the property in dispute.

Mr. Carlisle, who was sent by Mr. Doyle, the general superintendent, to examine and advise with respect to encroaching upon the Lynchburg turnpike with a side track, says that he reported against it upon the ground that it would throw the turnpike too close to the main track of the railroad. He states that he knew that a building for the Buggy Company was to be erected, and that no question of title or ownership of the lot upon which it was proposed to place it was brought to his attention.

Mr. Hotchkiss, general freight agent, knew nothing of the claim of title upon the part of appellees until March, 1899, when the building of the Buggy Company approached completion.

"The general rule of equitable estoppel, or, as it is frequently called, estoppel *in pais*, is that when one person, by his statements, conduct, action, behavior, concealment, or even silence, has induced another, who has a right to rely upon those statements, etc., and who does rely upon them in good faith, to believe in the existence of the state of facts with which they are compatible, and act upon that belief, the former will not be allowed to assert, as against the latter, the existence of a different state of facts from that indicated by his statements or conduct, if the latter has so far changed his position that he would be injured thereby." 4 Amer. & Eng. Decs. in Eq., 258.

In order to constitute an estoppel: "1. There must have been a representation or concealment of material facts. 2. The representation or concealment must have been with knowledge of the true state of facts, unless the party making it was bound

to know the facts, or his ignorance of them was due to gross negligence. 3. The party to whom it was made must have been ignorant of the truth of the matter as to which representation was made. 4. It must have been made with the intention that the other party should act on it; but the place of intent will be supplied by gross and culpable negligence on the party sought to be estopped, if the effect of that negligence is to work a fraud on the party setting up the estoppel. 5. The representation or concealment must be proved to have been the inducement to the action of the other party. 6. The party claiming the estoppel must have been misled to his injury." 4 Amer. & Eng. Decs. in Equity, 268.

"It may be stated, as a general rule, that the representation or concealment relied on to sustain an estoppel must have been made with full knowledge of the facts by the party to be estopped, unless his ignorance was the result of gross negligence or otherwise involves gross culpability, as where he is consciously ignorant of the facts at the very time of professing full knowledge of them.

"The rule has been laid down unqualifiedly that silence, in the absence of knowledge of one's rights, will not work an estoppel. Thus the omission to assert title to land against persons dealing with it as their own, in the absence of knowledge of such title, will not estop the owner to set up his claim thereto. On the other hand, it has been held that positive acts tending to mislead one ignorant of the truth, which do mislead him to his injury, are a good ground of estoppel, and ignorance of title or right on the part of him who is estopped will not excuse his act. Thus, where an owner positively encourages another to purchase land from a third person, on the faith that such third person is the owner, ignorance of the facts of the case on the part of the true owner will not, as a general rule, prevent the operation of an estoppel against him.

"It may be stated, as a general rule, that it is essential to the

application of the principle of equitable estoppel that the party·
claiming to have been influenced by the conduct or declarations·
of another to his injury, was himself not only destitute of the·
state of the facts, but was also destitute of any convenient and·
available means of acquiring such knowledge; and that, where·
the facts are known to both parties, or both have the same
means of ascertaining the truth, there can be no estoppel." 2·
Amer. & Eng. Enc. L. (2d ed.) 433-'4.

These citations, which are fully sustained by decided cases,
sufficiently present the law upon the general subject of equitable·
estoppel; but with respect to such estoppels when applied to the·
legal title to land, "it must appear that the party making his·
admission, by his declaration or conduct, was apprised of the
true state of his own title. 2. That he made the admission
with the express intention to deceive, or with such careless or·
culpable negligence as to amount to constructive fraud. 3.
That the other party was not only destitute of all knowledge of
the true state of the title, but of all means of acquiring such
knowledge. 4. That he relied directly upon such admission,
and will be injured by allowing its truth to be disproved." 2·
Pom. Eq. Jur., sec. 806.

"It is a purely equitable doctrine, settled long before the·
modern rules of equitable estoppel by conduct. It is confined
to estates in land. The general rule is that if a person inter-
ested in an estate knowingly misleads another into dealing with·
the estate as if he were not interested, he will be postponed to·
the party misled, and compelled to make his representation
specifically good. It applies to one who denies his own title or·
encumbrance when inquired of by another who is about to pur-
chase the land, or to loan money upon its security; to one who·
knowingly suffers another to deal with the land as though it
were his own; to one who knowingly suffers another to expend·
money in improvements without giving notice of his own claim·
and the like. This equity, being merely an instance of fraud,.

requires intentional deceit, or, at least, that gross negligence which is evidence of an intent to deceive. In the language of a most recent decision, to preclude the owner of land from asserting his legal title or interest under such circumstances, 'there must be shown either actual fraud, or fault or negligence equivalent to fraud, on his part in concealing his title; or that he was silent when the circumstances would impel an honest man to speak; or such actual intervention on his part so as to render it just that, as between him and the party acting upon his suggestion, he should bear the loss. . . . . . . While the owner of land may by his acts *in pais* preclude himself from asserting his legal title, it is obvious that the doctrine should be carefully and sparingly applied, and only on the disclosure of clear and satisfactory grounds of justice and equity. It is opposed to the letter of the statute of frauds, and it would greatly tend to the insecurity of titles if they were allowed to be affected by parol evidence of light or doubtful character.' " 2 Pom. Eq. Juris. (2d ed.), sec. 807.

There are many instances in equity jurisprudence of the application of the doctrine to conduct upon the party to be estopped which does not amount to an actual fraud, or to such gross disregard of the rights of others as courts consider its equivalent. If his conduct has been unconscientious or inequitable, though there has been no willful deception, a court of equity would, in a large variety of instances, forbid him to assert a right to the injury of another, inconsistent with his conduct. 2 Pom. Eq. Jur., secs. 801 to 815 inclusive, and note to section 806.

But with respect to the estoppel under consideration which affects the title to real estate, there must be the express intention to deceive, or such careless and culpable negligence as amounts to constructive fraud.

As was said by Field, C. J., in *Boggs* v. *Merced Min. Co.*, 14 Cal. 367: "It is undoubtedly true that a party will, in

many instances, be concluded by his declarations or conduct, which have influenced the conduct of another to his injury. The party is said in such cases to be estopped from denying the truth of his admissions. But to the application of this principle with respect to the title of property, it must appear, first, that the party making the admission by his declarations or conduct was apprised of the true state of his own title; second, that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; third, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; and, fourth, that he relied directly upon such admission, and will be injured by allowing its truths to be disproved.

"These qualifications in the application of the doctrine will be found fully sustained by the authorities. There must be some degree of turpitude in the conduct of a party before a court of equity will estop him from the assertion of his title— the effect of the estoppel being to forfeit his property, and transfer its enjoyment to another. 'In all this class of cases,' says Story, speaking of equitable estoppels, 'the doctrine proceeds upon the ground of constructive fraud, or of gross negligence, which, in effect, implies fraud. And, therefore, where the circumstances of the case repel any such inference, although there may be some degree of negligence, yet courts of equity will not grant relief. It has, accordingly, been laid down by a very learned judge that the cases on this subject go to this result only, that there must be positive fraud, or concealment, or negligence, so gross as to amount to constructive fraud.' " 1 Story's Equity, section 391.

In *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S., at p. 336, it is said: "It would seem that to the enforcement of an estoppel of this character with respect to the title of property, such as will prevent a party from asserting his legal rights, and the ef-

fect of which will be to transfer the enjoyment of the property to another, the intention to deceive and mislead, or negligence so gross as to be culpable, should be clearly established.

"There are undoubtedly cases where a party may be concluded from asserting his original rights to property in consequence of his acts or conduct, in which the presence of fraud, actual or constructive, is wanting; as, where one of two innocent parties must suffer from the negligence of another, he, through whose agency the negligence was occasioned, will be held to bear the loss; and where one received the fruits of a transaction, he is not permitted to deny its validity whilst retaining its benefits. But such cases are generally referable to other principles than that of equitable estoppel, although the same result is produced. Thus the first case here mentioned is the affixing of liability upon the party who from negligence indirectly occasioned the injury, and the second is the application of the doctrine of ratification or election. Be this as it may, the general ground of the application of the principle of equitable estoppel is as we have stated.

"It is also essential for its application with respect to the title of real property that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself, not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge."

Applying these just principles to the case before us, it must be apparent that it does not come under their influence. A corporation can be estopped from asserting title to real estate by the conduct of its agents acting within the scope of their authority, but there is nothing in the facts established in this case to show either a fraudulent intent upon the part of the company or of its officers, or such willful disregard of the rights of others as is necessary to estop the railroad company from the assertion of title to real estate, even though it were con-

ceded that the agents and officials, whose conduct is relied upon, were charged with such duties with respect to the possession and title to the real estate of the company as would bind it by their acts and declarations. The proof shows that, from the beginning to the end, appellees acted independently of any declaration, conduct, influence, or inducement on the part of the company. Walker furnished to the attorney for the railroad company the information as to the title upon which the opinion was based which for a time impaired the confidence of its general solicitor in the sufficiency of its title. He was misled by the opinion, based upon his own investigation, that the Canal Company had acquired by condemnation a strip of ground only 100 feet in breadth. It would appear that he had not consulted or considered the charter found in the Acts of 1835-'6, by which the company was authorized to acquire a strip 200 feet in breadth, and which transferred the proceedings to condemn from the County to the Circuit Court. The Industrial Company relied not upon the silence, the declarations, or the conduct of appellant, but upon the assurances given by Walker and Percy, and upon their deed with general warranty; and the instrument under which the Norfolk & Western Rwy. Co. claims refutes its pretension to be treated as an innocent purchaser, and proves that it anticipated a conflict with respect to the title, and assumed the burden of its vindication.

In any aspect of the case, if the charters of the Canal Company had been carefully considered, and diligent search been made among the records of the Circuit Court of Campbell county, every material fact which has since come to light would have been brought to the knowledge of all concerned.

It would be, indeed, a strange perversion of the beneficent principles which underlie the doctrine of equitable estoppel so to apply them as to forbid the appellant to assert its title under such circumstances.

The decree of the Circuit Court must be reversed, and this court will enter an order in conformity with this opinion.

On petition to rehear.    March 12, 1902.

We have carefully considered the petition to rehear the decree entered in this cause, and are of opinion that it should be denied. To give our reasons would be to reiterate what we have already said.

It has been suggested to us that the opinion does injustice to Mr. Blackford, of the firm of Blackford, Horsley & Blackford. In dealing with the question of equitable estoppel we quoted without commenting upon it, the testimony of Mr. Hughes, the secretary-treasurer of the Industrial Company, and of Mr. Gordon Payne, the president of that company, to refute the contention that that company had purchased in reliance upon any representation of fact made on behalf of the C. & O. Rwy. Co. We endeavored to show in treating this branch of the case that the evidence in the record, beginning with the filing of the bill by Walker in the Circuit Court of the city of Richmond, and coming down to the time when the Industrial Company purchased, showed that Walker and all those in adverse interest to the C. & O. Rwy. Co. acted upon information within their own knowledge; that they knew every fact that was known to Blackford, Horsley & Blackford, and could not, or at least should not, have been influenced by any opinion expressed upon those facts by a firm which had no connection with the case save as attorneys for the C. & O. Rwy. Co. No member of the firm is charged with having made any representation of fact which could have misled the appellees. There was no suggestion that the firm, or any member of it, acted in a double capacity or was guilty of any professional impropriety, and it is to exclude any possible inference or conclusion to that effect that in overruling the petition to rehear we insert this note.

*Reversed.*

The following is a copy of the decree entered in the case:

"Chesapeake & Ohio Railway Company, Appellant,
*v.*
"John Stewart Walker and Others, Appellees.

"Upon an appeal from a decree pronounced by the Circuit Court of the city of Lynchburg on the 21st day of September, 1900.

"This day came again the parties by counsel, and the court having maturely considered the transcript of the record, the decree aforesaid and arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the James River and Kanawha Company acquired by condemnation the fee simple title, with the rights of riparian ownership, to the land in the bill mentioned, and embraced within the metes and bounds of the Kennedy survey, which included all of the John Miller lot lying between the southern condemnation line of the said company's canal and low water line on James river, and that the appellant, as successor in title of the said James River and Kanawha Company, is the fee simple riparian owner of the lot condemned by the said company, clothed with capacity to take *jure alluvionis*, and that the water line from James river, no matter how it shifts, remains the boundary of its property, and that it and those under whom it claims having acquired title and possession, it attaches to all the accretions which have been added to it.   The court is therefore of opinion that the decree appealed from, so far as the same is in conflict with the foregoing opinion, is erroneous. It is therefore decreed and ordered that the same be reversed and annulled, and that the appellee pay to the appellant its costs by it expended in the prosecution of its appeal here, together with its costs by it expended in the court below.   And this court proceeding to enter such decree as the said Circuit Court ought to have entered, doth decree and order that the appellant be confirmed in its title to all the land

in the bill mentioned, which includes all of what is known as the John Miller lot lying between the southern limits of the James River and Kanawha ·Canal and James River, and that the deed from the Miller Manual Labor School of Albemarle to John Stewart Walker, dated December 16, 1896, and the deed from John Stewart Walker and Ellen E. Walker, his wife, to Alfred B. Percy, dated April 20, 1897, and the deed from Alfred B. Percy and Elizabeth Percy, his wife, and John Stewart Walker and Ellen E. Walker, his wife, to the Industrial Building Company, dated September 23, 1898, and the deed from the Lynchburg Industrial Building Company and the Hughes Buggy Company to the Norfolk & Western Railway Company, dated May 15, 1899, all of which deeds are of record in the clerk's office of the Corporation Court of Lynchburg, be, and the same are hereby, cancelled and annulled. And the court proceeding to remove from the records the cloud cast upon the appellant's title 'by said deeds, it is further decreed and ordered that the sergeant of the city of Lynchburg, who is hereby appointed a commissioner for the purpose, do convey and release, for and on behalf of the several grantees in said deed, all claim or title to the land therein described to the appellant and its successors.

"Which is ordered to be certified to the said Circuit Court."