# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### COVINGTON v. GRIFFIN'S ADMR. AND OTHERS.

#### FEBRUARY 15, 1900.

1. CHANCERY PLEADING AND PRACTICE—*Order for Account—Statute of Limitations.*—In a suit to settle the accounts of an executor and ascertain the debts against his decedent's estate, a decree for an account of debts stops the running of the statute of limitations as to all debts against the decedent.

2. CHANCERY PLEADING AND PRACTICE—*Statute of Limitations—Laches.*—Equity requires diligence in the *prosecution* as well as in the *institution* of suits, and, in the absence of any allegation of fraud or trust, will refuse its aid where there has been long and unexplained delay resulting in the death of parties and the probable loss of evidence.

Appeal from several decrees of the Circuit Court of Culpeper county, pronounced in a suit in chancery, wherein the appellee, Griffin's administrator, was the complainant, and the appellant and others were the defendants.

*Reversed.*

The opinion states the case.

*G. D. Gray* and *W. L. Jeffries*, for the appellant.

*Hay & Jeffries* and *Grimsley & Miller*, for the appellees.

KEITH, P., delivered the opinion of the court.

Zachary Griffin died in 1852 leaving a will, which was admitted to probate in June of that year. James M. Griffin, one of his sons, qualified as his executor, and, in 1854, attempted an *ex parte* settlement of his accounts before a commissioner, and,

proof of debts against the estate being called for, Thomas I. Griffin, a brother of the executor, appeared and claimed that his father was indebted to him by bond, a copy of which he filed before the commissioner in the sum of $2,000. For some reason the *ex parte* settlement was not made. In 1856 James M. Griffin filed a bill in his own right and as executor of his father, praying a settlement of his accounts as executor, to the end that the debts due by the testator might be paid, and his estate distributed among those entitled. A reference was made to a commissioner to settle the executorial accounts, and ascertain the debts, and in 1860 a report was filed showing a balance due by the executor of $1,266.33, and two debts against the estate—one in favor of Amy Hall amounting, principal and interest, to $447.81, and the other due by bond as aforesaid to Thomas I. Griffin, amounting, principal and interest, at the date of the settlement, to $3,447.48. Thomas I. Griffin died in 1857, and James M. Griffin qualified as one of the administrators upon his estate, so that he became the administrator of the creditor at the time that he was the executor of Zachary Griffin, the debtor. It appears from the settlement of the executor's accounts that the estate of Zachary Griffin consisted in great part of slaves, which were emancipated as a result of the war, and the balance in money in the hands of the executor was the proceeds of the hire of those slaves.

The report of the commissioner was excepted to, but the exceptions do not appear in the record. As the account was made up upon items furnished by the executor, it may be fairly presumed that the tendency of the exceptions was to increase rather than diminish his liability. The exceptions were never passed upon, and the report remained unconfirmed. No further action seems to have been taken in the case until 1897, when a paper termed a "supplemental bill and bill of revivor" was filed. In the mean time, nearly all of the original parties to the suit had passed away. Thomas I. Griffin, as we have seen, died in

1857, James M. Griffin, the executor of the debtor and administrator of the creditor, had died some years before 1897, and his administrator is not made a party to this proceeding.

There is no circumstance alleged in the supplemental bill which in any degree explains, accounts for, or extenuates the failure to prosecute the original suit for the settlement of the estate of Zachary Griffin. It merely recites the existence of the debt from Zachary, the father, to Thomas I. Griffin, the son, that it is unpaid, and that the only assets for its payment is the small tract of land in the possession of Thomas H. Covington, who holds it under the will of James M. Griffin. Save in these respects, and the multitudinous parties who are named as defendants in it, the bill is as bare as a declaration in debt.

Covington, the principal defendant, answered the bill, denying the existence of the debt, asserting that the evidence in proof of its ever having existed is insufficient, and further alleging that it had in any event long since been paid off.

We are of opinion that the record shows that Zachary Griffin in his lifetime executed the bond in controversy.

We are further of opinion that the decree entered in the original suit stopped the running of the statute of limitations as to all the debts due by Zachary Griffin, and there is much in the case to repel the presumption of payment arising from lapse of time. The executorial accounts show a credit of $200 paid upon this debt to Thomas I. Griffin in 1855. There is no evidence of any other payment, and it appears that James M. Griffin, the executor, was, after the war, without resources, and largely dependent for his support upon assistance derived from others.

There is evidence tending to repel the suggestion that the debt was paid to Thomas I. Griffin by board furnished him by the executor. The debt was contracted in 1848. This suit was instituted in 1856. Thomas I. Griffin died in 1857. All of the parties in interest, their personal representatives, and the

creditors, if any, and distributees interested in their respective estates lived in the county of Culpeper, where the courts were always open, except for a brief period during the war, and where a suit was actually pending in which their rights could and should have been long since ascertained.   There is nothing in the pleadings to show that Thomas I. Griffin was indebted at the time of his death.  If any such debts existed, they must have long since perished by the statute of limitations and presumption of payment.   The debt now claimed, if recovered, would go to his distributees, and, as he died unmarried and without issue nearly fifty years ago, those distributees would be in great part, at least, those named as the defendants to the supplemental bill which presents a long catalogue of unknown heirs and non-resident defendants, and scarcely a name common to the original and supplemental bills.

The existence of the debt is strenuously denied, its payment is earnestly asserted, not only by the defendant who has answered, but James M. Griffin, now long since dead, claimed in his lifetime that it had been settled years ago.

It is to be observed that the pleadings do not set up any fraud or trust.   It is not alleged that James M. Griffin, the administrator of Thomas Griffin, was guilty of a *devastavit* in failing to collect this debt, or that he collected it and failed to pay it over.   James M. Griffin is not before the court in any capacity.   It appears that at one time he represented this debt both as debtor and creditor, and he asserted in his lifetime that it was no longer an existing demand, and that he would be able to show the fact whenever he was required to do so.   This matter, it appears by the evidence of one of the witnesses, " has been talked about by every Griffin in the county, and has been kept up as a conversation in the neighborhood," and yet under the circumstances which have been narrated, the suit for the recovery of this debt thus controverted—the subject of unceasing conversation among those interested—has been allowed

to slumber for nearly half a century. It is true, that the evidence which has survived this great lapse of time, and which is now presented for our consideration, inclines the mind to believe that it has never been paid, and is still a valid and subsisting demand, but who can tell how much has been lost or obscured, or forgotten, or has perished with those who have passed away in all these years? Who can say that the positive assertion of James M. Griffin that the whole matter had long since been settled is untrue? The courts have uniformly and wisely held, after a long and unexplained delay in instituting or prosecuting a suit for the recovery of a debt, especially where there is no allegation of fraud or trust, that the allaying hand of time shall be deemed to have composed all strife, and quieted all contention, so that "men who are mortal shall not permit controversies to become immortal."

As was said by the Supreme Court of the United States in *Randolph* v. *Ware*, 3 Cranch, 507: " The charge is stale. The claim comes too late. It is brought forward after a sleep of near thirty years, during which period the original parties and their agents have disappeared and are no more. An acquiescence for such a length of time, and under such circumstances, is too stubborn and inveterate to be surmounted. The claim was put into oblivion; and there it ought to have remained." *Booten* v. *Booten*, 29 S. E. 823.

Said Chief Justice Taney, in *McKnight* v. *Taylor*, 1 How. 168: " It is not merely on the presumption of payment, or in analogy to the statute of limitations, that a court of chancery refuses to lend its aid to stale demands. There must be conscience, good faith, and reasonable diligence, to call into action the powers of the court. In matters of account, where they are not barred by the act of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice

when the original transactions have become obscure by time, *and the evidence may be lost.*"

And in *Smith* v. *Clay,* 3 Brown's Ch. Rep. 640 (note), it is said: " Nothing can call forth a court of chancery into activity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced; and, therefore, from the beginning of this jurisdiction there was always a limitation of suit in this court," from which it appears that "reasonable diligence" is as essential to the granting of relief in equity as conscience and good faith. *Piatt* v. *Vattier,* 9 Peters, 416.

It certainly cannot be said that there has been reasonable diligence in the case before us. For these reasons we are of opinion that the decree of the Circuit Court should be reversed, and the supplemental bill dismissed.

CARDWELL, J., dissents.

*Reversed.*