# Staunton.

## LUSK AND OTHERS v. PELTER & CO. AND OTHERS.

September 17, 1903.

Absent, Buchanan, J.*

1. EQUITY JURISDICTION—*Consent—Partition—Ejectment.*—Where a bill has been filed for the partition of land in the adverse possession of third persons, and subsequently an action of ejectment has been instituted against said third persons to recover the land, it is competent for the parties, being all before the court in the chancery suit, to agree that all questions of law and fact affecting the title to the land in controversy shall be adjudicated in the chancery suit.

2. ADVERSE POSSESSION—*Evidence—Reputed Claim of Ownership.*—Where one claims title by open, notorious, and adverse possession for a period sufficient to give good title, it is competent for him to prove not only that he had possession, but that the possession was under a claim of right, and that his claim and the character of his possession were such that he was generally reputed in the neighborhood to be the owner.

3. EQUITY PRACTICE—*Commissioner's Report—Findings of Fact—Conflicting Evidence.*—The findings of a commissioner in chancery on a question of fact will not, as a rule, be disturbed where the evidence is conflicting, and it appears that the evidence was taken by the commissioner or in his presence, and he has thus had the advantage of noting the demeanor of the witnesses, and their intelligence and manner of testifying. In the case in judgment the findings of the commissioners establishing title in appellees by adverse possession are fully sustained by the evidence.

Appeal from two decees of the Circuit Court of Augusta county, pronounced January 11, 1901, and December 27, 1901, respectively, in a suit in chancery wherein the appellants were the complainants and the appellees were the defendants.

*Affirmed.*

*Judge Buchanan was detained at home by sickness.

The opinion states the case.

*John E. Roller* and *C. S. W. Barnes*, for the appellants.

*Elder & Elder*, for the appellees.

WHITTLE, J., delivered the opinion of the court.

At the May term, 1894, of the Circuit Court of Augusta county, appellants filed a bill in equity against appellees, in which they allege that their ancestor, William Lusk, late of Rockbridge county, died seized and possessed of the property in controversy, consisting of ten acres of land situated in the county of Augusta, on the head waters of South river, near Vesuvius, known as the "Black Rock Iron Ore Mine," also called "William Moore's Old Ore Bank."

It is further alleged that the defendants, John Echols, H. M. Bell, and R. H. Catlett, had taken possession of the land under claim of title, and had leased it to Pelter & Co., who were then in possession, and had removed and were removing large quantities of valuable ore from the mine.

The relief sought is that the court will clear the title to the property, and partition it among the plaintiffs as their rights appear.

The defendants rely upon adverse possession under color of title for the statutory period, and the further defence that the plaintiffs are estopped by their conduct and that of their ancestor, William Lusk, from asserting title to the land. In their answer they set forth circumstantially their claim of title and the grounds of their defence.

In November, 1897, pending these proceedings, appellants instituted an action of ejectment in the same court against appellees for the recovery of the land. But subsequently, on November 27, 1897, by consent of all parties, a decree was entered in the chancery cause, which provided that all questions

of law and fact affecting the title of the land in the bill and proceedings mentioned might and should be adjudicated in that suit. *Hannon* v. *Hounihan,* 85 Va. 429, 12 S. E. 157.

By a former decree the cause was referred to one of the commissioners in chancery of the court to inquire into and make report touching the matters in controversy. That report, upon exceptions, was recommitted to the same commissioner for review in the light of the exceptions. The result of the recommittal was the commissioner's second report, filed October 16, 1900. By his last report the commissioner ascertains that the paper title of the plaintiffs is complete, and that they are not estopped to assert that title against the defendants either by their own conduct or that of their ancestor, William Lusk. .

With respect to the remaining question—the adverse possession of the property by the defendants and their predecessors in title—the commissioner finds and reports: "That the holding of this property by Mathew Bryan (under whom the defendants claim) was actual, open, notorious, and adverse, and of a character sufficient to perfect title; that it continued in Bryan long enough to and did ripen his title into a good title against the world."

The commissioner also finds "that the holding of Jamison Mc-Guffin, and those who held under him, was under color of title, and also of a character sufficient to perfect the title in the defendants, even if they took none through the holding of Bryan."

At the January term, 1901, the case was heard on the second report of the commissioner, with the evidence returned therewith and the exceptions taken thereto, whereupon the court confirmed that report with certain modifications, and, being of opinion that those of the defendants who claim title to the land in dispute as representatives of the late firm of Echols, Bell & Catlett are the true owners thereof, dismissed the plaintiffs' bill with costs.

The plaintiffs afterwards sought to have that decree reviewed

for alleged errors of law apparent upon its face and upon newly discovered evidence. At the hearing the bill of review was dismissed, and the case is now here upon appeal from those decrees.

The case was before the commissioner for several years, and a careful consideration of the record attests the intelligent diligence with which he addressed himself to his task.

As the main transactions under investigation cover a period dating from the year 1833 down to and including the year 1854, they are naturally in some degree obscured by lapse of time, death of parties, and loss of evidence. Nevertheless, a painstaking examination of all the evidence has satisfied this court that the findings of the commissioner that Mathew Bryan acquired title to the property by actual, adverse possession for twenty years—the length of time necessary to give title under the statute prior to July 1, 1850—is fully sustained. *Hollingsworth* v. *Sherman*, 81 Va. 668.

The fact that Bryan was for many years in absolute and undisputed possession of the property, actively and continuously engaged in mining ore therefrom, and that the general understanding in the neighborhood was that he was the owner of the property, is proved by the testimony of many witnesses. Only one witness, however—John W. Cash—undertakes to speak with certainty as to the time at which that possession first commenced. He fixes the year with precision, and the accuracy of his memory is so corroborated by circumstances as to justify the conclusion that the year 1833 was the date at which Mathew Bryan first took possession of the mine.

Cash was 12 years old at the period of which he speaks. He testifies that he was born near Vesuvius, and had known the Black Rock mine since 1833; that Mathew Bryan took possession during that year; that he was generally reputed to be the owner of the property, and remained in the open and notorious possession of it and operated the mine until his death, in 1854; that the property was afterwards sold at public auction at Mid-

way as part of the real estate of Mathew Bryan, after having been generally advertised.

Upon cross-examination he emphasizes his evidence in chief by explaining that his father worked at Vesuvius furnace, two miles distant from the mine, and that as a boy he frequently rode on the carts which hauled ore from the mine to the furnace.

In connection with this direct and positive testimony of the witness, Cash, it appears from an ended chancery case of Mathew Bryan against Edward Bryan's widow and heirs, brought in the Circuit Court of Rockbridge county in the year 1847 for the purpose of ratifying an agreement entered into between Mathew Bryan and Edward Bryan's heirs, made in 1841, and a supplemental agreement made between those parties in 1847, that the parties were to divide the real estate held in partnership by Mathew and Edward Bryan. And the bill shows that long prior to the death of Edward Bryan, in 1838, he and Mathew Bryan had profitably conducted the business of mining and smelting iron ore, and in the course of their business had acquired large properties, among which was "Moore's Old Ore Bank" (the property in dispute). The agreements were approved, and the court entered a decree appointing a commissioner to execute the necessary deeds to carry them into effect, and in pursuance thereof the property was conveyed by the commissioner to Mathew Bryan in the year 1850.

Other witnesses testify that Bryan was in possession of the mine long anterior to that date, and was generally reputed to be the owner.

In *Maxwell Land-Grant Co.* v. *Dawson*, 151 U. S. 588, 14 Sup. Ct. 458, 463, 38 L. Ed. 279, the court, at page 603, says: "There was no error in admitting testimony to the effect that the land claimed by Dawson was generally reputed to belong to him. Claiming, as he did, by open, notorious, and adverse possession of those lands for a period sufficient . . . to give

him a good title, it was competent to prove that it was generally
understood in the neighborhood, not only that he pastured his
cattle upon those lands, but that he did so under a claim of
ownership, and that his claim and the character of his posses-
sion were such that he was generally reputed to be the owner."

After the death of Mathew Bryan a bill in equity was filed in
the Circuit Court of Rockbridge county by Margaret J. Bryan
against his administrator and others for the settlement of his
estate.   A. M. Lusk, a son of William Lusk, and others, were
appointed appraisers to value the real estate, and returned a
report November 15, 1854, which embraced the land in con-
troversy.

The property was subsequently sold under a decree in that
case, and purchased by Mathew Drawbond, who assigned his
purchase to J. D. McGuffin, to whom the land was conveyed
April 6, 1860, by S. McD. Moore, the commissioner who made
the sale.   After sundry sales and conveyances the title to the
property passed to and lodged in appellees.

The circumstances attending the sale by S. McD. Moore,
which will be presently adverted to, show conclusively that at
the date of the sale William Lusk had parted with his interest
in the property, and asserted no title thereto.   To repel the con-
tention that Bryan's possession of the property commenced in
1833, appellants call attention to the fact that the witness Cash
states that Bryan took possession when he bought the Vesuvius
furnace, and that his deed to that property bears date January
27, 1840; also that Lusk was charged with land on the land
books for the years 1838, 1839, and 1840; and to the further
fact that Lusk's deed, although dated and acknowledged in
1833, was not admitted to record until 1837.

They likewise produce a written agreement between David S.
Moore and Edward S. Bryan and Mathew Bryan, dated July
28, 1836, by which Moore, in consideration of seven tons of
castings, agreed to convey the land to the Bryans.   This agree-

ment, which was discovered after the entry of the decree of January 11, 1901, in favor of appellees, is made the basis of appellant's bill of review.

In light of the reports of the commissioner as to the carelessness which obtained at that time in that neighborhood with respect to executing and recording deeds, it would seem that undue weight is given by the appellants to the date of the deed to the Vesuvius furnace and the contract of D. S. Moore with the Bryans as tending to fix the time at which Mathew Bryan first took possession of the property; *non constat*, but that both said deed and contract were based upon prior parol agreements for sale, accompanied by possession—a theory which must be accepted, unless the uncontradicted testimony of Cash and other witnesses is to be disregarded.

In that connection the commissioner says: "The records show that parties in buying and selling land at that time in this neighborhood were extremely careless about the execution and recordation of deeds; nor is any particular weight attached to the fact that this land was assessed for the years 1838, 1839, and 1840 in the name of Lusk. Bryan had no deed to this property, and in making up the land-book the record title was naturally the guide of the compilers. These facts are not sufficient to overcome the direct evidence of Cash and the other witnesses that Bryan was working this property before 1840, which evidence is nowhere contradicted, and nowhere questioned, except by the circumstances just narrated."

The agreement between Moore and the Bryans in 1836, by which the former agrees to sell the property of the latter, is another circumstance tending to show that Lusk had parted with his interest therein prior to that time, and, as shall be seen presently, the inference is greatly strengthened by the conduct of William Lusk.

The testimony of H. I. Ford proves admissions by Lusk, which shed a flood of light on the conduct of himself and his

sons, and makes plain a course of conduct on their part which would be otherwise inexplicable. It shows that in 1855, at the date of the commissioner's sale to Mathew Drawbond, Lusk asserted no claim whatever to the property. The witness says that he was a master miner for Bryan for the four years next preceding his death. That a short time before Bryan died they had a settlement, which showed a balance due witness of $175, for which sum a due-bill was given; that after Bryan's death his administrator gave notice to creditors to bring forward their claims, and file them with William Lusk, who was a magistrate, at Midway. When the property was sold at Midway, John La Rue acted as auctioneer and William Lusk as clerk of the sale. Witness sought out Lusk, and asked, in the event of his buying the property, if he would get a good title and his debt be allowed as a payment on the purchase price; to both of which inquiries Lusk replied in the affirmative. Upon that assurance witness bid $200 for the property, but Mathew Drawbond bid $300, and it was cried out to him. Witness further states that Lusk not only did not claim the property, or make objection to the sale on the occasion referred to, but encouraged the bidding.

J. A. M. Lusk, a son of William, denies that his father was present at the sale; but the commissioner, who heard both witnesses testify, accepted the evidence of the disinterested witness, Ford, rather than that of the son and plaintiff, J. A. M. Lusk, and gives it as his opinion that the latter had doubtless confounded the sale in question with the sale of the Cotopaxi property, which occurred the following June.

The commissioner says, in respect to the countervailing evidence relied on by appellants:

"The only evidence tending to show that Bryan did not own this property is that of J. A. M. Lusk, a son of William Lusk, who states that his father told him in 1847 that he was the owner of this property; while James A. Harvey and J. S. Anderson testify that they saw a lease for this property from Lusk

to Bryan among the papers in that chancery suit in the Circuit Court of Rockbridge county, in which Mathew Bryan's estate was administered. No other witness has been introduced to show, nor any testimony produced tending to show, that Lusk claimed to be the owner of this property; nor has any evidence been introduced to show that he was during the said time generally reputed to be its owner.

"In the cause in which this property was sold as the property of Mathew Bryan was filed (so Harvey and Anderson state) the lease therefor from Lusk to Bryan, showing clearly that this property belonged to Lusk, and not to Bryan. No note was taken of such paper as this in any of the decrees entered in that cause, and said property was sold as the property of Bryan after due advertising without objection on the part of any one.

"Harvey and Anderson are men of intelligence, who knew the value of such a paper as they claimed to have discovered; indeed, they were hunting these records to see if they could ferret out a title in the Lusk heirs to any of the property which Lusk had formerly owned, it being agreed that they were to have a certain percentage of what they recovered; yet they took no note of said lease, no copy thereof, and are the only people who claim ever to have seen it."

Where evidence consists of the depositions of witnesses, and they are taken by the commissioner, or in his presence, he has the advantage of noting the demeanor of the witnesses, their intelligence and manner of testifying, which is of importance in judging of their credibility and weighing their evidence; and the findings of a commissioner on a question of fact will not, as a rule, be disturbed when the evidence is conflicting. *Shipman* v. *Fletcher*, 91 Va. 479, 22 S. E. 458; *Taylor* v. *McDonald*, 100 Va. 487, 41 S. E. 946.

As sustaining the theory of appellees, the commissioner also reports: "William Lusk was a man of affairs, who lived near this property. He was a reader of the newspapers, and knew

that it was advertised for sale.  A. M. Lusk, a son, one of
Bryan's appraisers, had listed this property as a part of Bryan's
estate.  J. A. M. Lusk, who was then sheriff of Rockbridge
county, another son, was present at the sale.  Lusk knew that
the property was to be sold as the property of Bryan.  He must
have known it was sold on the day advertised.  He must
have known of Drawbond's purchase, and of his transfer to
McGuffin, because he was a near neighbor, and because this
property was at that time a property of note.  He lived for
some years after this sale, and, so far as the evidence shows, was
never heard to question its validity."

It furthermore appears that the property passed off the land-
books in the name of William Lusk in 1840, and that he and
those claiming under him were never again charged with it for
taxation.  After the sale of 1855, they permitted the property
to pass from purchaser to purchaser, without objection, for the
recorded title of appellees subsequent to that sale is unbroken;
and for all these years made no demand and asserted no title to
the property, until the institution of this suit in 1894.

It is inconceivable that intelligent people, laboring under no
disability, and possessed of full knowledge of their rights,
would have delayed the assertion of those rights for more than
a half-century if they had been well founded.

This court having reached the conclusion that the adverse
possession of Mathew Bryan prior to 1854 clothed him, and
those claiming under him, with an indefeasible title to the prop-
erty in question, it is unnecessary to notice the other matters of
defence relied on and discussed.

The decrees complained of are without error, and are af-
firmed.

*Affirmed.*