Syllabus.

# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## Chesapeake and Ohio Canal Co., et als. v. Great Falls Power Company.

October 1, 1925.

Absent, Christian, J.

1. STATUTES—*Constitutionality—Valid in Some Respects, Void in Others.*—A statute may be valid in some respects and void in others. If unconstitutional provisions are so interwoven with those that can be sustained as to make severance impossible the entire act must fall, but not otherwise.

2. CORPORATIONS—*Charter of Power Company—Charter not Invalid Because Containing Unconstitutional Provisions as to the Exercise of the Power of Eminent Domain—Case at Bar.*—In the instant case the constitutionality of the charter of complainant, a power company, was attacked on the ground that it undertook to confer upon complainant power to take private property for public uses by the exercise of the right of eminent domain, without defining the public uses for which private property might be taken, and also undertook to confer power to conduct an enterprise for either private or public purposes, and left it to the corporation to determine which are private and which are public. Every grant in the charter incident to the exercise of the power of eminent domain or which pertains to public duties, if stricken out, would still leave a perfectly good charter for a private corporation. Strike this power from the charter and the corporation as a legal entity not only *de facto* but *de jure* remains. A charter is not void because some of its provisions are.

3. CORPORATIONS—*Charter of Power Company—Charter not Invalid Because Containing Unconstitutional Provisions as to the Exercise of the Power of Eminent Domain—Case at Bar.*—In the instant case it was urged that complainant's charter was invalid because of the power of eminent domain conferred thereby. There was no attempt to exercise that power and the force of the charter provisions granting it was in no way involved.

   *Held:* That even assuming that the grant of the power of eminent domain was unconstitutional, it would not affect the matters raised in the instant case.

4. CONSTITUTIONAL LAW—*Attacking Statute as Unconstitutional—Party Must Show that he is within the Class with Respect to Whom the Act is*

Syllabus.

*Unconstitutional.*—One who would strike down a State statute as violative of the Federal Constitution must show that he is within the class with respect to whom the act is unconstitutional, and must show that the alleged unconstitutional feature injures him, and so operates as to deprive him of rights protected by the Federal Constitution.

5. Estoppel—*Acceptance of Benefit of Statute—Limitations of Statute also Accepted—Case at Bar.*—In the instant suit complainant accepted the benefits of an act of the General Assembly of Maryland (Laws of Maryland 1894, ch. 540) granting it certain privileges. In accepting this act all of its provisions were accepted—those which limited rights as well as those which conferred them.

6. Estoppel—*Acceptance of Benefit of Statute—Limitations of Statute also Accepted—Case at Bar.*—In the instant case, a suit to quiet title, which involved the title to a strip of land known as the "canal strip," if the canal company (defendant), by reason of adverse possession or for any other reason, had lost title to the canal strip, then it had no vested right thereto within the meaning of an act obligating complainant not to occupy, use, interfere with or damage any property or right vested in defendant, the canal company, and the principle that complainant was estopped by acceptance of the benefit of the statute, had no application, and the canal company's title to the strip cannot be assumed when to test that right was the particular purpose of the instant suit.

7. Quieting Title—*Complainant's Paper Title—Notations in Plaintiff's Deeds and Knowledge of Parties of Rights of Defendant—Case at Bar.*—In the instant case, a suit to quiet title to property known as the "canal strip," complainant had an unbroken paper title going back to a grant from King James II to the property in question. In some of the deeds in its chain the existence of the canal strip was noted and the parties to these deeds had both actual and constructive notice of the canal and its rights. But in no deed was the canal strip excepted from its operation.

*Held:* That complainant's paper title was not affected by the notations and the knowledge of the parties.

8. Eminent Domain—*Reverter—Where Fee is Acquired—Where Qualified or Terminable Fee is Acquired.*—Where the condemnation vested a fee, the general rule is that the land does not revert to its former owner when it ceases to be used for the purpose for which it was condemned. Where a qualified or terminable fee is acquired, and the right to use the land has been lost, the title and rights revert to the original owner. Where an easement only was acquired and the right to enjoy the easement is lost, the owner of the fee has the right to reenter and to use the property just as if it had never been condemned.

9. Eminent Domain—*Title to Property Taken—Whether Fee is Acquired.*—When the statute under which land is taken, fairly construed, con-

tains any provision to indicate that less than a fee is taken, that provision governs. The corporation only takes such title as its charter authorizes or as the statute of eminent domain gives under proper procedure.

10. CANALS—*Right of Way—Title Acquired by Purchase—Title Acquired by Eminent Domain—Case at Bar.*—Where a section of the charter of a canal company gave the company unrestricted power to purchase land necessary for the right of way, the right to take title absolute gives to it that title which any natural person purchasing would take. And when the section goes on to provide the necessary machinery for condemnation proceeding where the owners are unwilling to sell, and a commission is directed to value the land, not some interest in the land, but the land itself, and in express terms states that when payment shall have been made the company taking "shall be seized in fee of such land, as if conveyed by the owner to them, and their successors, by legal conveyances," the title taken over by the company is the same in each instance. The title from condemnation is as absolute as the company had power to take from a voluntary vendor.

11. CANALS—*Right of Way—Title Acquired—Provisions for Surplus Water—Case at Bar.*—Where the charter provision empowering a canal company to condemn lands for a right of way provided that the company should take a fee to the land condemned, a further provision, giving proprietors of adjoining land certain preferences in the use of the surplus water, gave to the original owners no right whatever to the land itself.

12. EMINENT DOMAIN—*Canal Company—Charter Provisions Wanting in Due Process of Law—Charter Provisions not Complied with—Acquiescence—Case at Bar.*—In the instant case, a suit to quiet title, it was urged that condemnation proceedings by defendant canal company were void in *toto* because the charter provisions therefor were wanting in due process of law, and because these provisions themselves were not observed in some essential particulars. The proceedings were had in 1792 and in 1797 work was completed, and the canal operated until 1833 when it was abandoned. Thus the statute and the proceedings thereunder were acquiesced in for more than a hundred years and a court of equity will not hold them void.

13. ADVERSE POSSESSION—*Canal Companies—Right of Way—Case at Bar.*—A canal company under condemnation proceedings alleged to be void held the "canal strip" in controversy under claim and color of title open, obvious, continuous and hostile from 1797 to 1833, when it abandoned it. To perfect title under such a holding twenty-five years was all that was necessary under the law as it then was.

*Held:* That the canal company had at the date of its abandonment in 1833 title to the "canal strip" in fee simple, such a corporation having power to acquire title by adverse possession.

14. ADVERSE POSSESSION—*Enclosures—Case at Bar.*—In the instant case, where complainant asserted title to the land in controversy by adverse possession, the entire property was partially enclosed by a fence. But one boundary was not fenced. The evidence showed that along this boundary the land was so steep as to make a fence impractical and unnecessary.

    *Held:* That only such enclosures were necessary as were permitted by the nature of the property.

15. ADVERSE POSSESSION—*Claim Under Color and Claim of Title.*—Where one under claim and color of title holds lands, partially enclosed and cultivated, in continuous, open and hostile possession, paying taxes on the entire tract for about seventy years, he acquires the title in fee simple.

16. ADVERSE POSSESSION—*Color of Title—Extent of Claim*—A claim under color of title extends to the boundaries of the grant.

17. ADVERSE POSSESSION—*Property which may be Acquired by Adverse Possession—Canals, Railroads, Etc.*—There is little analogy between streets, highways, asylums for the insane maintained by the State, etc., and private corporations like railroads affected with a public interest. Title by adverse possession may ripen against unused portions of a railroad right of way, and there is no difference in principle between railroads and canals when they are owned and operated by private corporations.

18. ADVERSE POSSESSION—*Canal Companies—Case at Bar.*—In the instant case, a suit to quiet title, defendant, a canal company, once held good title to the "canal strip" in controversy but lost it by abandonment and by the adverse possession of complainant, a power company, and this was not affected by the fact that the defendant corporation was a public service one, nor by the fact that the State was a shareholder therein and a guarantor of some of its bonds.

Appeal from a decree of the Circuit Court of Fairfax county. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Caton & Caton,* for the appellant.

*Barbour, Keith, McCandlish & Garnett,* for the appellee.

HOLT, J., delivered the opinion of the court.

For convenience the parties, plaintiff and defendants, will be designated here as they were in the court below.

The Great Falls Power Company is a corporation chartered by an act of the General Assembly of Virginia, approved March 3, 1894. (Acts 1893-94, c. 605.)

The purposes for which it was chartered were:

"For the purpose of acquiring, holding, improving and using water power at and near the Great Falls, in the Potomac river, and for constructing dams therein, canals and other hydraulic and auxiliary steam works, which acts are hereby authorized, and for the selling and leasing of water power, and for using the same for manufacturing and other purposes, and for generating, transmitting, selling and leasing electricity, electric power and light for railway and canal as well as other purposes, including also power to acquire by right of eminent domain, in case the use is public, or by purchase or otherwise, and to hold and improve real and personal property for the foregoing purposes in Virginia, or elsewhere, and to sell, lease and mortgage the same, subject to all laws of the State of Virginia now in force in relation to other like corporations.

"In case private property shall be taken for any of the public uses provided for in this act, and the parties cannot agree as to the taking and the damages to be paid therefor, proceedings may be had under section twelve hundred and eighty-eight and twelve hundred and eighty-nine of the Code of Virginia of eighteen hundred and eighty-seven." Sections 1, 2.

This plaintiff claims to be the owner in fee simple of three certain tracts of land, known in this record as:

1. The Great Falls tract.
2. The John T. Jackson tract.
3. The R. R. Jackson tract.

Their location is made plain by a sketch in outline hereto attached:

The defendants do not question plaintiff's title to these properties except to the extent they affect what is known in this record as the canal strip. This land in

controversy is a strip commencing on the western bank of the Potomac river seventy-three poles below the stone marked W. F. X., a monument readily located, and ends at the bank of said river about 103 poles above the mouth of Spring branch. Said strip of land is about 5,500 feet in length and is supposed to be 140 feet in width. It is slightly tortuous, but its general course from its upper to its lower end is south about 25 E., also an additional acre adjoining said strip on its western side about eighteen hundred feet from its lower end, all of which was acquired by the Potomac Company under an act of the General Assembly of Virginia, passed October, 1784 (11 Hening's St. at Large, p. 510). This holding, except one-half acre, was acquired by condemnation proceedings had in the years 1792 and 1797. The one-half acre came by deed from Tobias Lear of date June 21, 1803.

Title to this strip of land is the subject matter of this suit. All of it lies within the Great Falls tract. Plaintiff claims under deed from Great Falls Manufacturing Company dated April 2, 1895, and recorded on July 15, 1895, in Fairfax county clerk's office, in D. B. T. 5, page 516, and by mesne conveyance back to a grant from King James II to Thomas, Lord Culpeper, dated the 27th day of September, 1688. This title is regular upon its face and we do not deem it necessary to note the deeds which are the links therein.

The Chesapeake and Ohio Canal Company also claims to own this canal strip in fee and, except as to the Tobias Lear half-acre, claims under condemnation proceedings noted in which the interest of Bryan Fairfax was taken over, and particularly under a deed from the Potomac Company of Virginia of date August 15, 1828. It thus appears that these titles go back

to a common source, since Bryan Fairfax is one of plaintiff's predecessors in title. These condemnation proceedings were had in Loudoun county, but the property condemned is now in Fairfax.

The inducing cause immediately leading to the institution of this suit was an action to condemn and take over this canal strip, brought by the Potomac River Power Company, a Virginia corporation chartered by act of the General Assembly of date January 21, 1896 (Acts 1895-96, c. 95), although in the background was the shadow of the claim of the canal company.

The prayer of the bill is that the Chesapeake and Ohio Canal Company and all who claim under it and the Potomac River Power Company and all who claim under it be enjoined from all dealings relative to this canal strip and that the plaintiff's title therein be quieted.

Final decree was entered in the circuit court of Fairfax county at its September term, 1923. That decree provided in part as follows:

"Upon consideration whereof the court, overruling all of said demurrer and exceptions and being of opinion that the plaintiff, the Great Falls Power Company, as duly incorporated (and) holds a good and valid title to the parcel of land in the bill and proceedings mentioned and described therein as the 'Canal Strip' and to the riparian and other rights appertaining thereto, the court doth so adjudge, order and decree, and doth further adjudge, order and decree that the plaintiff be quieted in its title and possession of all said property against the Chesapeake and Ohio Canal Company, and all others claiming under, through or by it; that the injunction heretofore awarded in this cause be perpetuated, and that the plaintiff recover of the defendants its costs in this behalf expended.'"

From this decree an appeal has been taken by the Chesapeake and Ohio Canal Company and its trustees.

There are eight assignments of error.

The first deals with the action of the court in over-ruling demurrers to the original and amended bills. This has not been insisted upon as an independent assignment for the reason that the matters relied upon to sustain it are set up in detail in other assignments.

The second assignment of error is that the trial court erred in holding the Great Falls Power Company to be duly incorporated and in refusing to hold its charter unconstitutional, null and void.

A detailed statement of its objection is:

(a). The act of the General Assembly upon which the appellee relies for its incorporation, undertakes to confer upon it power to take private property for public uses by exercise of the right of eminent domain, without defining the public uses for which private property may be taken.

(b). The act undertakes to confer power to conduct an enterprise for either private or public purposes, or both, at its option, and leaves it to the corporation to determine which uses are private, and which are public.

(c). It is impossible to determine from the act for what public uses the appellee may condemn private property. Its powers to conduct business for both private and public uses are so intermingled that it is impossible to determine from the act which uses are private and which are public.

[1] That a statute may be valid in some respects and void in others is too well established to need further elaboration. If unconstitutional provisions are so interwoven with those that can be sustained as to make severance impossible the entire act must fall, but not otherwise. *City of Danville* v. *Hatcher*, 101

Va. 528, 44 S. E. 723; *Bertram* v. *Commonwealth*, 108 Va. 902, 62 S. E. 969; *Miller* v. *Town of Pulaski*, 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 55; *Boyd* v. *Ritter Lumber Co.*, 119 Va. 348, 183 S. E. 273, L. R. A. 1917A, 94; *Waters-Pierce Oil Co.* v. *Deselms*, 212 U. S. 159, 29 S. Ct. 270, 53 L. Ed. 453.

[2] In the legislative charter in judgment every grant incident to the exercise of the power of eminent domain or which pertains to public duties if stricken out would still leave a perfectly good charter for a private corporation. Strike this power from this charter and the corporation as a legal entity not only *de facto* but *de jure* remains. A charter is not void because some of its provisions are.

[3] If we assume that the grant of the power of eminent domain is unconstitutional it would not affect the matters raised here. There is here no attempt to exercise that power and the force of the charter provisions granting it is in no way involved.

[4] As was said by the Supreme Court of the United States in *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531-544, 34 S. Ct. 359, 363, 58 L. Ed. 713-719, in passing on a similar question:

" * * * * The difficulties suggested are hypothetical rather than practical * * * .

"We may once more repeat what has been so often said that one who would strike down a State statute as violative of the Federal Constitution must show he is within the class with respect to whom the act is unconstitutional, and must show that the alleged unconstitutional feature injures him, and so operates as to deprive him of rights protected by the Federal Constitution." Citing *Southern Railroad Co.* v. *King*, 217 U. S. 524, 534, 30 S. Ct. 594, 54 L. Ed. 868, 871;

*Standard Stock Food Co.* v. *Wright*, 225 U. S. 540, 550, 32 S. Ct. 784, 56 L. Ed. 1197–1201; *Rosenthal* v. *New York*, 226 U. S. 260, 271, 33 S. Ct. 27, 57 L. Ed. 212, 217, Ann. Cas. 1914B, 71.

It is premature and unnecessary to pass upon the validity of. this grant of extraordinary power. That can be done when the Great Falls Power Company undertakes to exercise it.

[5, 6] It is next said that the plaintiff is estopped in equity from any claim of title to the canal strip because of the provisions of an act of the General Assembly of Maryland of date April 6, 1894, (Laws 1894, c. 540). That act, after the grant of certain privileges to plaintiff, provides: "Provided, that nothing in this act shall be construed to give said Great Falls Power Company authority to interfere with any existing right of the United States, or of any person or corporation in said Potomac river, or the waters thereof; provided the acceptance of this act shall oblige and bind the said Great Falls Power Company to take, occupy, use, interfere with, or damage no property or right vested in the Chesapeake and Ohio Canal Company acquired as the successor of the Potomac Company or otherwise, and to endanger no part of the canal or works of said canal company in any degree of liability to flood, except by or under written agreement or agreements between said power company on the one part, and the said canal company and the trustees for the time being of the bondholders of said canal company under its mortgages of 1848 and 1878 on the other part, and approved by the board of public works."

When the provisions of this act were accepted all of its provisions were accepted—those which limited rights as well as those which conferred them. That particular provision which dealt with the canal company is:

"Provided that the acceptance of this act shall obligate and bind said Great Falls Power Company to take, occupy, use, interfere with or damage no property or right vested in the Chesapeake and Ohio Canal Company acquired as the successor of the Potomac Company or otherwise."

If the canal company, by reason of adversary possession or for any other reason, had lost title to this canal strip, then it had no "vested" right thereto, none of its "existing rights" were violated and the principles of estoppel have no application. In support of them we cannot assume title to be in the canal company when to test that right is the particular purpose of this suit. At the date of this act this property was owned by the Great Falls Manufacturing Company. The act itself bears date April the 6, 1894, and the deed conveying the "Great Falls Tract" with the canal strip thereon from the Great Falls Manufacturing Company to the Great Falls Power Company is dated April 2, 1895. The virtue of this conveyance will be noted later.

The General Assembly of Maryland probably intended to protect the canal company, whose activities had long since been transferred wholly to the north bank of the Potomac river, in its properties in that State from any encroachments by this Virginia corporation. But whether that be true or not, we may with confidence rest upon the letter of the statute. No rights of the canal company were dealt with except rights vested as of the date of the act.

It is next said:

[7] "The appellee has not a straight paper title to the 'Great Falls Tract,' including the 'canal strip.' "

The decree appealed from did not in terms declare that the plaintiff had a straight paper title and that it so held is not a necessary inference. The court below

may have been of opinion that the canal company had only a base fee in the land in litigation and had forfeited title. It may have been of opinion that plaintiff's title had been perfected by adversary possession without color of title under a *bona fide* claim of right.

As a matter of fact it has a straight paper title. It is true that in some of the deeds in its chain the existence of this canal strip is noted and it is also true that the parties to these deeds had both actual and constructive notice of the canal and its rights. The fact remains that there is an unbroken paper title in this plaintiff which goes back to the grant from King James II to this Great Falls tract and in it the canal strip is no where excepted from its operation.

[8] The next assignment deals with the character of the estate taken by the Potomac Company and its successor, the canal company, to the land in controversy. Is the estate one in fee simple, or is it a base, conditional or qualified fee.

These are the charter provisions relied upon.

Section 12 recites:

"And whereas some of the places through which it may be necessary to conduct said canals may be convenient for erecting mills, forges, and other water works, and the persons possessed of such situations may design to improve the same * * * it is the intention of this act not to interfere with private property, but for the purpose of improving and perfecting the said navigation.

Section 13 reads in part as follows:

"Be it enacted that the water or any part thereof conveyed through any canal or cut made by said company shall not be used for any purpose but navigation."

Section 11 reads in part as follows:

"And on payment thereof" (the damages assessed by the jury) "the said company shall be seized in fee of such land, as if conveyed by the owner to them, and their successors, by legal conveyance."

Section 13 is:

"Be it enacted that the water, or any part thereof, conveyed through any canal or cut made by the said company, shall not be used for any purpose but for navigation, unless the consent of the 'proprietors' of the land through which the same shall be led, be first had; and the said president and directors * * * are hereby empowered and directed, if it can be conveniently done, to answer both the purposes of navigation and water works aforesaid, to enter into reasonable agreements with the proprietors of such situation, concerning the just proportion of the expenses of making large canals or cuts capable of carrying such quantities of water as may be sufficient for the purposes of navigation and also for any such water works as aforesaid."

The substance of some of the decisions is that the corporation takes only an easement in its property and forfeits its right upon abandonment, and this though it may appear to hold title in fee. See *Lake and Rowe v. Isley*, circuit court of Elizabeth City county, 13 Virginia Law Register 600, and editorial note. See also *U. S. Pipe-Line Co. v. Delaware, etc., R. C. Co.*, 62 N. J. Law 254, 41 Atl. 759.

In 20 C. J., section 598, is this statement of the law:

"Where the condemnation vested a fee the general rule is that the land does not revert to its former owner when it ceases to be used for the purpose for which it was condemned. Where a qualified or terminable fee iis acquired, and the right to use the land has been lost n one of the ways mentioned above, the title and rights

revert to the original owner. Where an easement only was acquired and the right to enjoy the easement is lost, the owner of the fee has the right to reenter and to use the property just as if it had never been condemned."

This statement of the law accurately expresses its status in Virginia. The general doctrine of reverter has not been adopted. So far from adopting it, the legislature has deemed it necessary to provide for reverter by express statute in the case where a railroad shifted its location, section 6379 of the Code, a declaration that would have been unnecessary had mere abandonment been sufficient to effect a reconveyance of the fee.

[9] Of course, when the statute under which the land is taken, *fairly construed*, contains any provision to indicate that less than a fee is taken, that provision governs. The corporation only takes such title as its charter authorizes or as the statute of eminent domain gives under proper procedure.

[10] Section 11 gives the unrestricted power to purchase land necessary for the right of way, and of necessity, the right to take title absolute gives to it that title which any *natural* person purchasing would take.

This section of this charter then goes on to provide the necessary machinery for condemnation proceedings where the owners are unwilling to sell. The commission is directed to "value the land," not some interest in the land, but the land itself, and in express terms states that when payment shall have been made the company taking "shall be seized in fee of such land, as if conveyed by the owner to them, and their successors, by legal conveyances." From this it appears that the title taken over by the company is the same in each

instance. That from condemnation is as absolute as it had power to take from a voluntary vendor.

[11] What is there in section 13 to suggest a different conclusion? That section makes provision for surplus water. It was never the legislative intent to bestow the power of eminent domain merely in order that mills or forges might be operated, but it seemed wise after the major purpose had been accomplished, and a highway for transportation established, to permit use of surplus water since this could be done without damage to any one. In so doing and in following out the declared purpose of the statute to interfere as little as possible with private rights, it gave to the proprietors of adjoining land certain preferences in the use of this surplus water, but this had nothing whatever to do with title to the land and the proprietors mentioned in this section are proprietors in lands adjacent, through which water might be conducted, and not those who had once held a proprietary interest in the canal strip itself and which had been lost either through sale or condemnation. We see nothing in this statute to indicate a purpose on part of the legislature to give to these original owners any right whatever to the land itself.

The character of title taken in such cases has in varied forms frequently been before this court. In Blondell v. Guntner, 118 Va. 11, 86 S. E. 897, a head note sustained by the decision itself is as follows:

"Under section 1079 of the Code, where land is condemned by a railroad company for its purposes, and the sum ascertained to be due the landowner is paid to him or into court, the absolute fee simple title to the land (and not a base fee) is vested in the company, and there is no reverter to the former owner except in the single case provided for by section 1089

of the Code where the company afterwards changes its location. If there be no change of location the company can sell and convey title to any excess beyond its needs of the land condemned."

In *C. & O. Ry. Co.* v. *Walker*, 100 Va. 69, 40 S. E. 633, 914, character of title taken by the James River and Kanawha Canal Company was in issue. The title in judgment there came through condemnation proceedings had in 1836. The statute under which this proceeding was conducted declared that "the land viewed and assessed as aforesaid shall be vested in the James River and Kanawha Company in the same manner as if the proprietor had sold and conveyed it to it," which is in substance the law as it was when the Potomac Company instituted its proceedings for condemnation.

Judge Keith in discussing the title says:

"When we consider the act as a whole, that the company was authorized to purchase without any limitation, express or implied, upon the interest thus to be acquired; when we find it stated more than once in the act that the land condemned shall be, upon the payment of the purchase money, 'vested in the James River and Kanawha Company as if the proprietor had sold and conveyed it to them;' when we consider the vast magnitude of the work to be constructed, the enormous outlay which was contemplated, and the enduring character of the improvement, we cannot doubt, in the absence of all express restriction in the acts of incorporation, that the legislature intended to confer, and did confer, upon the James River and Kanawha Company power to acquire by condemnation or purchase the fee simple interest in the lands to be occupied by its works." *Chesapeake and Ohio Ry. Co.* v. *Walker, supra.*

In *Glass* v. *Columbian Paper Company*, 111 Va. 404, 69 S. E. 354, it was said:

"There is no merit in the allegation that the abandonment of navigation in North river in the year 1881 caused the property rights once vested in the North River Navigation Company and its successors to revert to the riparian owners."

See also *Old Dominion Company* v. *Chesapeake and Ohio Railway Company*, 116 Va. 166-171, 81 S. E. 108; *Roanoke* v. *Berkowitz*, 80 Va. 616.

In *James River and Kanawha Company* v. *Anderson*, 12 Leigh (39 Va.) 278, the court had occasion to consider the title to certain lots held by the James River Company. This company was chartered by an act of the General Assembly of Virginia, passed October, 1784, and was given *mutatis mutandis* the charter of the Potomac Company. Exactly the same provisions are made for the acquisition of title by purchase and condemnation. The court in the *Anderson Case* said that the lots of this company were acquired by one of these two methods and proceeded to deal with them as having been the absolute estate of that corporation.

We reach the conclusion that the Potomac Company and its successors took title to this canal strip in absolute estate, and are entitled to all of those rights which follow.

[12] It is next said that these condemnation proceedings were void in toto because the charter provisions therefor were wanting in due process of law and because these provisions themselves were not observed in some essential particulars.

The work itself was begun in 1785 and good progress made. Later it became necessary to resort to condemnation and two proceedings were had, one in 1792 and another in 1797, under which the work was

completed on this section of the canal and it was operated until 1833, at which time it had become apparent that a canal on the south bank of the Potomac was impracticable. Operations were transferred to the north shore and the canal has continued to function there until today.

To ask a court of equity to hold that a statute and proceedings had thereunder are void though acquiesced in for more than a hundred years is to ask a good deal. As Judge Keith observed in *Covington* v. *Griffin*, 98 Va. 128, 34 S. E. 975: "Men who are mortal shall not permit controversies to become immortal."

In *Lusk* v. *Pelter*, 101 Va. 790, 45 S. E. 333, Judge Whittle observes:

"It is inconceivable that intelligent people, laboring under no disability, and possessed of full knowledge of their rights, would have delayed the assertion of those rights for more than a half century if they had been well founded."

That necessity for acquiescence in conditions long established which led in part to the judgment in *Old Dominion, etc., Co.* v. *C. & O. Ry. Co.*, 116 Va. 166, 81 S. E. 108, applies here with equal force, and though we fix no limit as to time a century is sufficient.

[13] If this were not true the result would be the same, for this canal company under claim and color of title, open, obvious, continuous and hostile, held this canal strip probably from 1785 and certainly from 1797 to 1833. To perfect title under such a holding twenty-five years was all that was necessary. See act of the General Assembly of Virginia, passed February 5, 1831. We therefore reach the conclusion that this canal company had at the date of its abandonment in 1833 title thereto in fee simple. Such a corporation had power to acquire title by adverse posses-

sion. *Ohio River R. Co.* v. *Johnson*, 50 W. Va. 499, 40 S. E. 407.

[14-16] Remaining assignments bring up for consideration plaintiff's right growing out of adverse possession on its part.

This possession has stood from 1854 to the institution of this suit, or for about seventy years, under color and claim of title. The lot a, b, c, d, as shown on the plat was entirely enclosed and on it an agent was maintained. It was cultivated in part and put in such uses as its nature permitted. The entire canal strip is and has been partially enclosed by a fence which appears upon the plat as a broken line a, b, c, e, f, g, h, i, k, l, m. The line m, n, was not fenced. The evidence shows that along this boundary m, n, the land was so steep as to make a fence impractical and unnecessary. Only such enclosures are necessary as are permitted by the nature of the property. *Hollingsworth* v. *Sherman*, 81 Va. 668-671; *Craig Iron Co.* v. *Wickline*, 126 Va. 223, 101 S. E. 225; Minor Real Property, section 1033. However, the lot a, b, c, d, was enclosed and occupied. The defendant had abandoned the canal strip in 1833, and so this claim under color of title extended to the boundaries of the grant. *Blacksburg, etc.* v. *Bell*, 125 Va. 656, 100 S. E. 806; *Whealton* v. *Dougherty*, 112 Va. 649, 72 S. E. 112.

During all of this time plaintiff paid taxes on the entire Great Falls tract, which, of course, included the canal strip, and was in continuous, open and hostile possession.

We therefore reach the conclusion that a fee simple title had ripened in the Great Falls Manufacturing Company and that such title was conveyed to the Great Falls Power Company by its deed of April 2, 1895. To this the canal company answers that even if

this be true as between private parties it is not true here, for title by adverse possession cannot be established in a public highway, and that the canal strip and property appurtenant is by its charter made a public highway. The charter in fact provides that this canal shall be a public highway when completed. It was not completed, but was abandoned and its operations, as we have seen, were transferred to the Maryland shore of the Potomac river.

Taking up this proposition on its merits we find it to be true that the weight of the authority is to the effect that title by adverse possession cannot be acquired in streets and highways, though there is respectable authority to the contrary, and sometimes a distinction is made in cases where there appears to have been a permanent abandonment.

In Virginia the law is in accordance with the law generally in this country. *Depriest* v. *Jones*, 2 Va. Dec. 109, 21 S. E. 478; *Yates* v. *Town of Warrenton*, 84 Va. 337, 4 S. E. 818, 10 Am. St. Rep. 860; and other Virginia authorities there cited are to this effect. This subject is discussed in an extended note in 87 Am. St. Rep. 775. The law applicable to railroads is stated to be: "And while it is perhaps true that there can be no adverse possession of that portion of a railroad right of way which is covered by the track or buildings, or is in use by the railroad, this is so, not because of any public use to which it is devoted, but because 'the presence of a track constantly in use is a definite badge of ownership and the only practical assertion of title that can be made.' Jones on Easements, section 281. If, however, an individual has, for the statutory period, enjoyed a possession of a portion of a railroad right of way, adverse to the title of the railroad company, by the great weight of authority,

title will vest in him to the exclusion of the corporation." Many cases cited.

In the late case of *Raton* v. *Pollard* (C. C. A.), 270 Fed. 5, the court said:

"The general and approved rule is that title may be gained by adverse possession to portions of a railroad company's right of way."

In *Alexander, etc., Storage Company* v. *Central Railway of Georgia*, 182 Ala. 516, 62 So. 745, the court said:

"This same rule, however, does not apply to a railroad right of way which is not in actual use. Title to portions of it may be acquired by adverse possession and may be thereby vested in an individual so acquiring it, to the exclusion of the railroad corporation. There is good reason for the difference of the two rules. While the right of way is, in a sense, a public highway, and the land is taken for and devoted to a public use, it is nevertheless the private property of the public utility corporation. The corporation's officials are not public officers, and its objects and purposes are private as well as public in a sense."

In Freeman's note in 87 Am. St. Rep. *supra*, it is said:

"On principle there would seem to be no reason for exempting a railroad company from the operation of the statute of limitations. Its right of way, however much it may be devoted to a public use, remains private property. Its officials are not public officers in any true sense; its object is private gain. Streets and highways belonging to and created for the sole purpose of benefiting the public are uses in no way analogous to that of a railroad right of way. A railroad company has what a public officer has not, a direct and cuniary interest in using diligence to assert its claims

to any land held by it. There can be no question of legalizing a public nuisance by lapse of time. Sovereign rights are not involved. None of the considerations which render the application of the doctrine of adverse possession to public rights inexpedient and unwise are here present, and it is difficult to see why the same rule as that governing individuals and private corporations should not here control."

[17] There is little analogy between streets, highways, asylums for the insane maintained by the State, etc., and private corporations like railroads affected with a public interest. We have no difficulty in reaching the conclusion that title by adversary possession might ripen against unused portions of a railroad right of way.

On the other hand, there is no difference whatever in principle between railroads and canals when they are owned and operated by private corporations.

"Whatever proprietary title the trustees of a canal company assert to property distinct from the public use to which it is dedicated, is subject to be extinguished by adverse occupancy during the statutory period. And where they abandon the canal, title to the bed of the canal may be acquired by adverse possession." 2 C. J. section 475.

In *Collett* v. *Vanderburgh County*, 119 Ind. 27, 21 N. E. 329, 4 L. R. A. 321, a canal bed was in litigation. The court said:

"Where the rights of the public could not have been directly surrendered, they cannot be lost or subverted indirectly by the laches or supineness of those who are charged with the duty of protecting them. *Sims* v. *Frankfort*, 79 Ind. 446; *Burbank* v. *Fay*, 65 N. Y. 57; *Pittsburgh, Ft. W. & C. R. Co.* v. *Reich*, 101 Ill. 157; 1 Am. & Eng. Enc. of Law 297; 2 Dill. Mun. Corp., sec. 669.

"The appellant is not, however, in a situation to invoke the aid of the principles above enumerated. He is not before the court respecting the public, nor is he asserting a right to eject the board of Commissioners of Vanderburgh county, so that he may use the property in question as a public highway. The foundation of his claim rests upon an assertion that the canal was abandoned as a public highway as early as the year 1860, and that in consequence he has acquired the title theretofore had for public purposes by the board of trustees of the Wabash and Erie Canal, as an individual, which he is now asserting for his personal benefit. The property having been abandoned for public purposes, the State and the public having acquiesced in that abandonment for more than twenty years, it is now too late to assert a mere private proprietary interest in the land as such, against those who took and maintained actual possession in good faith and rescued the property at great expense from becoming a public nuisance."

The case of *Bond* v. *Murray*, 118 Md. 445, 84 Atl. 655, dealt with the title of the defendant canal company and it was there held that no title to its right of way could be acquired by adverse possession but that judgment was largely based on an act of the General Assembly of Maryland, chapter 287, Acts 1844, and there had been in Maryland no abandonment of the right of way.

We think these authorities are ample to support the proposition that the statute runs in cases between private individuals and public service corporations in their private capacity.

This case has been argued with conspicuous thoroughness and ability and it has not been possible within reasonable limits to discuss in detail the host of authori-

ties cited and relied upon. Matters presented in addition to the law involved are replete with historical interest.

[18] The substance of our conclusions are: The canal company once held good title to this canal strip and has lost it by abandonment and by adverse possession, and this conclusion is not affected by the fact that the defendant corporation was a public service one, nor by the fact that the State was a shareholder therein and a guarantor of some of its bonds. *Johnson* v. *Black*, 103 Va. 477, 49 S. E. 633, 68 L. R. A. 264, 106 Am. St. Rep. 890. The decree appealed from must be affirmed.

*Affirmed.*